## 05 CV 10445

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

GREEN MEADOWS PARTNERS, LLP, Individually
and on Behalf of All Those Similarly Situated,

          Plaintiff,

    --against --

RICHARD A. BARASCH, ROBERT A. WAEGELEIN
and GARY W. BRYANT,

          Defendants,

    --and--

UNIVERSAL AMERICAN FINANCIAL CORP.

          Nominal Defendant.

------------------------------------------------------------x

Civil Action No.:

**VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT**

**JURY TRIAL DEMANDED**

:

RECEIVED
DEC 13 2005
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff, by its attorneys, submits this shareholder's derivative complaint against the defendants named herein. The allegations are asserted on information and belief after due investigation of counsel, except as to those matters which relate to plaintiff and its own acts, which are asserted on personal knowledge.

## NATURE OF THE ACTION

1. This is a shareholder's derivative action brought on behalf of nominal defendant Universal American Financial Corp. ("Universal American" or the "Company"), a New York corporation with headquarters and principal place of business in Rye Brook, New York. In this action, plaintiff, on behalf of Universal American, alleges that defendants, who are officers and/or directors of the Company, breached their fiduciary duties to the Company by issuing

materially false and misleading information to the investing public regarding the Company's projected medical loss ratio for the 2005 fiscal year. The medical loss ratio is a very closely watched metric that is an expression of the relationship between the cost of health care provided to premium income. An increase in the medical loss ratio means higher expenses relative to premium income, which in turn indicates that the Company is becoming less profitable.

2.    On or about November 22, 2005, a shareholder securities class action lawsuit was filed against the Company and defendants Richard A. Barasch, Robert A. Waegelein and Gary W. Bryant alleging violations of the Securities Exchange Act of 1934 (the "Exchange Act") in the United States District Court for the Southern District of New York, (hereinafter referred to as the "Class Action"). The Class Action asserts claims on behalf of purchasers of the securities of Universal American between February 16, 2005 and October 28, 2005, inclusive (the "Class Period").

3.    According to the Class Action Complaint, Defendants' scheme: (i) deceived the investing public regarding Universal American's business, operations, and management; (ii) enabled Universal American and certain Company insiders to sell more than $120 million of their privately held Universal American shares during the time that Universal American shares were artificially inflated and while in possession of material adverse non-public information about the Company; and (iii) caused plaintiff and other members of the Class to purchase Universal American common stock at artificially inflated prices.

4.    Universal American is a specialty health and life insurance holding company. Through its family of companies, Universal American offers a broad array of health insurance and managed care products and services to the growing senior population. The Class Action

2

complaint alleges that defendants' Class Period representations regarding Universal American were materially false and misleading when made, for the following reasons:

(a)    The rate at which the Company's medical expenses were rising relative to premium income was much greater than reported;

(b)    Defendants' financial statements were not in compliance with GAAP and SEC rules because defendants had not disclosed all trends, conditions and adverse factors adversely affecting the Company throughout the Class Period; and

(c)    Defendants lacked any reasonable basis to claim that if Universal American was operating according to plan, Universal American could achieve guidance sponsored and/or endorsed by defendants.

5.    The Class Action alleges that the truth began to emerge on October 28, 2005, when Universal American announced its financial results for the third quarter ended September 30, 2005. The Company announced that the Medicare Supplement loss ratio for the third quarter was 71.9%, approximately *290 basis points higher* than Universal American's third quarter target.    Following this announcement, shares of Universal American fell 33 percent in regular trading.

6.    According to the Class Action Complaint, each of the defendants knew and/or recklessly disregarded numerous false or misleading statements made during the Class Period regarding Universal American's estimate of its 2005 medical loss ratio.  Each of the defendants was an active participant in the wrongdoing alleged and/or profited substantially from insider trading during the Class Period.

3

7. As a result, Universal American has been severely damaged by the wrongdoing alleged herein. Defendants, by acting in breach of their fiduciary duties have exposed the Company to massive liability under the federal securities laws and have severely damaged Universal American's reputation in the securities markets. It would be unfair and inequitable for the shareholders of Universal American to bear the direct or indirect burden to pay these damages caused by the defendants, and therefore, plaintiff seeks to require the defendants to make recompense to the Company.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this action pursuant to 28 U.S.C 1331 (federal question jurisdiction) insofar as this action arises under both Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. 78j(b), pursuant to which there is a private right of action for contribution, and Section 21D of the Private Securities Litigation Reform Act, 15 U.S.C. 78u-4, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act. Prior to Congress having enacted an express provision for contribution under Section 21D of the Exchange Act, the United States Supreme Court recognized that a federal cause of action existed for contribution pursuant to Section 10(b) of the Exchange Act and Rule 10b-5. See Musick, Peeler & Garrnett v. Employers Insurance of Wausau, 508 U.S. 286 (1993). Thus, pursuant to federal statutory law and Supreme Court authority, this Court has original federal question jurisdiction over the Federal contribution claim alleged herein. This Court also has subject matter jurisdiction over the pendent state law claims asserted herein pursuant to 28 U.S.C. 1367 (supplemental jurisdiction), since this statute provides that the district court has supplemental jurisdiction over all other claims where, as here, they are

4

so related to claims in the action within the original jurisdiction of the Court, that they form part of the same case or controversy.

9. This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

10. Venue is proper in this judicial district pursuant to 28 U.S.C. 1391(b). A number of the wrongful acts and practices contained of herein occurred in this District. Nominal defendant Universal American maintains its headquarters in this District.

11. In connection with the violations of law alleged herein, the defendants used the means and instrumentalities of interstate commerce including the United States mail, interstate wire and telephone facilities, the facilities of the national securities markets and the Internet to distribute the false and misleading statements complained of herein.

## PARTIES

12. Plaintiff Green Meadows Partners, LLP ("plaintiff") is, and was at all relevant times, a shareholder of nominal defendant Universal American.

13. Defendant Richard A. Barasch ("Barasch") has served as a Director of the Company since 1988, as Chairman of the Board since December 1997, as Chief Executive Officer since June 1995 and as President since April 1991. During the Class Period, Defendant Barasch sold 220,000 Universal American shares for total proceeds exceeding $4.2 million.

14. Defendant Robert A. Waegelein, C.P.A. ("Waegelein") has served as Executive Vice President and Chief Financial Officer of the Company since October 1990. During the Class Period, Defendant Waegelein sold 60,000 Universal American shares for proceeds of more than 1.3 million.

5

15.    Defendant Gary W. Bryant ("Bryant") has served as Executive Vice President for the Company since June 1995 and Chief Operating Officer of the Company since June 2000. During the Class Period, Defendant Bryant sold 120,000 Universal American shares for proceeds of more than 2.7 million.

16.    Defendants Barasch, Waegelein and Bryant are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Universal American's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and/or had free and unfettered access to same, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of these Individual Defendants knew that the adverse facts specified herein, as alleged in the Class Action Complaint, had not been disclosed to and were being concealed from the public and that the positive representations being made were materially false and misleading. The Class Action Complaint alleges that certain of the Individual Defendants are liable under the federal securities laws for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

17.    Nominal defendant, Universal American is a New York corporation with its principal place of business located at 6 International Drive, Rye Brook, NY 10573-1068.

## THE MISSTATEMENTS AND OMISSIONS OF MATERIAL FACT
## IN VIOLATION OF THE SECURITIES EXHANGE ACT
## ALLEGED IN THE CLASS ACTION

18.    The allegations in this section summarize the essential allegations of the complaint in the Class Action (the "Class Action Complaint.") The Class Action Complaint alleges that as a result of defendants' intentional misstatements and omissions, the market price of Universal American shares was artificially inflated from February 16, 2005 through October 28, 2005, inclusive (the "Class Period").

19.    Universal American's principal health insurance products for the senior market are Medicare Supplement and Medicare Advantage. Universal American also sells specialty health insurance to self-employed individuals in the United States and Canada, as well as life insurance and fixed annuities. The Company distributes these products through a career agency system and an independent general agency system. It also provides administrative services for senior market insurance and non-insurance programs to both affiliated and unaffiliated insurance companies. Collectively, the Company's insurance subsidiaries are licensed to sell health insurance and life insurance in all 50 states, the District of Columbia, Puerto Rico and all the provinces of Canada. Its managed care subsidiary operates Medicare Advantage health plans in Texas, New York and Pennsylvania, as well as other locations. Universal American has more than 1,200 employees in four main locations. The company is traded on the NASD National Market system under the ticker symbol "UHCO."

20.    The Class Period in the Class Action commences on February 16, 2005. At that time, Universal American issued a press release announcing "record" setting results for the fourth quarter and full year ended December 31, 2004. Universal American reported net income of $17.4

million, or $0.23 per share, on revenues of $206.6 million, compared to net income of $13.1 million or $0.23 per share for the same period the prior year.

21.     Defendant Barasch commented that the fourth quarter of 2004 was "another strong quarter" and the Company "experienced core growth of 21% in revenues and 20% in profits from our existing businesses as compared to last year." With respect to the Company's medical loss ratio, Defendant Barasch stated the following:

> For the full year, the loss ratio on our Medicare supplement business increased by 80 basis points to 69.1% from 68.3% in 2003 and segment income was 1% lower than last year. We have already begun to apply for and implement rate increases that should allow us to reverse this trend.

22.     On March 8, 2005 during the Raymond James Institutional Investors Conference, held in Orlando, Florida, Defendant Barasch reiterated many of the same or similar materially false and misleading statements previously published in the Company's press release dated February 16, 2005.

23.     On or about March 16, 2005, defendants filed with the SEC the Company's 2004 Form 10-K for the year ended December 31, 2004, signed and certified by defendants Barasch and Waegelein. The Form 10-K reiterated the positive statements concerning the Company's operations and medical expense cost and ratios, and stated, in part, that the Company's financial statements have been prepared in accordance with accounting principals generally accepted in the United States ("GAAP").

24.     With respect to the Company's medical loss ratio, the Form 10-K stated, in pertinent part, the following:

> Most jurisdictions mandate minimum benefit standards and loss ratios for accident and health insurance policies. Generally we are required to maintain, with respect to our individual long term care policies, minimum anticipated loss ratios over the entire period of coverage. With respect to our Medicare Supplement policies, we are generally required to attain and maintain an actual loss ratio, after three years,

of not less than 65 percent of earned premium. *We provide, to the insurance departments of all states in which we conduct business, annual calculations that demonstrate compliance with required loss ratio standards for both long term care and Medicare Supplement insurance. We prepare these calculations utilizing statutory lapse and interest rate assumptions.* In the event we fail to maintain minimum mandated loss ratios, our insurance company subsidiaries could be required to provide retrospective premium refunds or prospective premium rate reductions. We believe that our insurance company subsidiaries currently comply with all applicable mandated minimum loss ratios. In addition, we actively review the loss ratio experience of our products and request approval for rate increases from the respective insurance departments when we determine they are needed. We cannot guarantee that we will receive the rate increases we request. [emphasis supplied.]

25.     According to the Class Action complaint, the statements contained in Universal American's February 16, 2005 Form 10-K, as well as those statements made by defendants during the Raymond James analyst conference were each materially false and misleading when made, and were known by defendants to be false or were recklessly disregarded as such thereby, for the following reasons, among others:

(a)     The rate at which the Company's medical expenses were rising relative to premium income was much greater than reported;

(b)     Defendants' financial statements were not in compliance with GAAP and SEC rules because defendants had not disclosed all trends, conditions and adverse factors adversely affecting the Company throughout the Class Period; and

(c)     Defendants lacked any reasonable basis to claim that Universal American was operating according to plan, or that Universal American could achieve guidance sponsored and/or endorsed by defendants.

26.     On March 30, 2005, defendant Barasch presented at the Lehman Brothers Eighth Annual Global Healthcare Conference in Miami, Florida. At that conference defendant Barasch reiterated many of the same, or similar, materially false and misleading statements as had been

published previously in the Company's 2004 Form 10-K, or in the Company's prior press releases - including the materially false and misleading statements relating to the Company's medical cost ratio controls that had been made previously.

27.     Between March 1, 2005 and May 2, 2005, the Company insiders sold substantial amounts of their personally held Universal American stock.   Defendant Barasch sold 60,000 shares for proceeds of almost $1 million.   Similarly, William Wehner, President of the Company's subsidiary, Pennsylvania Life, sold 150,000 shares for proceeds of $2.6 million.

28.     On May 3, 2005, Universal American issued a press release announcing another "record" setting results for the first quarter ended March 31, 2005.  Universal American reported net income of $16.1 million, or $0.28 per share, on revenues of $224.2 million, compared to net income of $13.9 million or $0.25 per share for the same period the prior year.

29.     Defendant Barasch, the Company's Chairman and CEO commented:

Although revenues rose by 12% to $99.2 million, as compared to the first quarter of 2004, results in our Senior Market Health segment were negatively impacted by higher morbidity, primarily from the increase in the deductible for Part B coverage. *Our Medicare supplement loss ratio increased 140 basis points to 72.8% from 71.4% in the first quarter last year, leading to a 14% decrease in segment income for the quarter. We have already applied for and will implement rate increases that should allow us to reverse this trend. As we have discussed previously, first quarter results in the Medicare supplement business are impacted by loss ratios that are seasonal and predictably higher than in the succeeding quarters, and we expect to see improvement throughout the balance of the year.* [emphasis supplied.]

30.     On May 10, 2005, defendants filed with the SEC the Company's Form 10-Q, for the first quarter ended March 31, 2005, that was signed and certified by defendants Barasch and Waegelein. The Form 10-Q contained certifications that were substantially similar or identical to those filed with the SEC by defendants concerning the Company operations and medical expense

costs and ratios as had been announced in the Company's press release, and stated, in part, that the Company's financial statements have been prepared in accordance with accounting principles generally accepted in the United States ("GAAP").

31. The statements made by defendants during the Lehman Brothers analyst and investor presentation, and those statements contained in the Company's May 3, 2005 press release and in Universal American's 2005 first quarter Form 10-Q, were materially false and misleading and were known by defendants to be materially false and misleading, or were recklessly disregarded as such, for the reasons stated in ¶ 25, *supra*.

32. Following the filing of the Company's Form 10-Q, on March 24, 2005, Universal American announced that defendant Barasch would present at the Banc of America Securities Health Care Conference on May 18, 2005 in Las Vegas, Nevada. At that conference defendant Barasch reiterated many of the same, or similar, materially false and misleading statements as had been published in the Company's Form 10-Q, including the materially false and misleading statements relating to the Company's medical cost ratio controls that had been made previously.

33. On June 6, 2005, Universal American announced that it had initiated a public offering of 7 million shares of common stock; 2 million shares were being offered by the Company and 5 million were being offered by Capital Z Financial Services Fund II, L.P., and its affiliates ("Capital Z") - Universal American's largest shareholder. Following this offering, Capital Z retained approximately 20.1 million shares, or approximately 34.9 percent of Universal American's outstanding common stock. Universal American granted its underwriters an option to purchase up to an additional 1.05 million shares of common stock to cover over-allotments, if any. Lehman Brothers and J.P. Morgan Securities Inc. served as joint book-running managers for the common stock offering.

34.    On June 17, 2005, defendants priced the Company's 7 million share offering at $23.61 per share, in addition to the over-subscription allotment, making the total value of the Offering at above $190 million. The shares were sold pursuant to a Prospectus.

35.    On August 2, 2005, Universal American issued a press release that again announced "record" setting results for the second quarter ended June 30, 2005. For the second quarter, Universal American reported net income of $18.7 million, or $0.32 per share, on revenues of $229.6 million, compared to net income of $13.0 million or $0.23 per share for the same period the prior year.

36.    Defendant Barasch, the Company's Chairman and CEO, commented:

Although our Medicare Supplement premium grew by 10% over the second quarter of last year as a result of new sales, reduced reinsurance ceded and rate increases, profits rose only by 5%. *In line with recent trends, our Medicare supplement loss ratio increased 200 basis points to 71.8% from 69.8% in the second quarter last year, in part as a result of the increase in the Part B deductibles. We continue to implement rate increases that, along with expected seasonal reductions in loss ratios, should result in more favorable results through the balance of the year.* In addition, profitability was impacted by the incunal of $0.4 million in direct expenses relating to the implementation of Part D. [emphasis supplied].

37.    During a conference call for analysts the next day, on August 3, 2005, defendants assured investors that the 200 basis point increase in the medical loss ratio was normal for that time of year and not evidence of a trend toward increasing medical loss ratios, stating, in relevant part, as follows:

Although revenues grew well, up more than 8% over the first quarter, our profitability was pressured by a higher medical loss ratio and higher expenses. A higher MLR [medical loss ratio] was mostly due to a reduction in revenues per member, and, as a matter of comparison, the MLR in the second quarter was similar to the MLR of Heritage in the second quarter of last year, the quarter in which we acquired the company.

12

<center>*************</center>

<Q - Scott Fidel>: Okay. And then second question it just has to do with the Medicare margins for this year. Obviously, the business is in growth mode right now, but just two things. One, just what do you think is a reasonable run rate on the medical loss ratio given that you received the risk adjustors last quarter for this year and then maybe longer term? And then also, what you think your SG&A expense trends will look like over the next few quarters just given your investments for future growth?

<A - Richard Barasch>: I think it's very hard to pin the medical loss ratio to a number because we're in the health insurance business and the numbers move, *but we're starting to see a pattern developing, somewhere between 71.5 and 72.5, on a consistent basis.* So I think that's a reasonable band to think about, although, it's likely that over time it will go to the higher part of that band. SG&A, I think, will be around 15 for the foreseeable future. We are spending money on a pretty consistent basis. We have a pretty good idea what sort of run rate versus sort of one time, but in the nature of looking at this we're kind of bringing those all together, and basically we're making this our investment in the go forward. [emphasis supplied].

<center>***************</center>

<Q - Josh Raskin>: [... ] Lastly, the guidance - it seems like if I exclude or if I put back, I guess, the impact of the secondary and then some of the Part D costs, it seems like the guidance may have kicked up a slight bit for the second half of the year. Were there any specific segments that we should think about changing?

<A - Richard Barasch>: You know, again I think it's pretty close to where we were, but I think that, and we can do the math, because a lot of it has to do with some variability in the Part D number because we've left ourselves a little room up and down given what happens with the bid. But I think directionally where we're definitely going to see improvement is in Med Supp. We've got, for sure, the seasonal improvement coming and a very significant amount of our rate increase activity starts kicking in the second half. So we're looking to maybe not get it all back from where we were last year, but get at least part of it back.

<A - Robert A. Waegelein>: *Josh, I think, as we indicated recently, we feel like the annual loss ratio will be about 100 basis points higher than last year. We're still comfortable with that increase. On an annualized basis these rate increases will bring our spread down to about that number.* In addition, the Part D expense number that we're adding we've diluted a little bit by the effect of the offering, and that might give you a little bit of how that number changes. [emphasis supplied].

<center>13</center>

38.    On or about August 9, 2005, defendants filed with the SEC the Company's Form 10-Q for the second quarter ended June 30, 2005, signed and certified by defendants Barasch and Waegelein. The Form 10-Q contained certifications that were substantially similar, or identical, to those filed previously with the SEC by defendants, and in addition to making substantially similar statements concerning the Company operations and medical expense costs and ratios as had been announced in the Company's press release it stated, in part, that the Company's financial statements have been prepared in accordance with accounting principles generally accepted in the United States ("GAAP").

39.    Following the publication of the Company's earnings announcement, on September 6, 2005, Universal American announced that defendant Barasch would present at the Bear Stearns 18th Annual Healthcare Conference on September 12, 2005 in New York City, NY. At that conference, defendant Barasch reiterated many of the same, or similar, materially false and materially misleading statements as had been published previously by defendants - including the materially false and misleading guidance relating to the Company's medical cost ratio controls that had been made previously.

40.    The statements made by defendants during the Bear Stearns analyst and investor conference, as well as those statements contained in the Company's August 2, 2005 press release, the August 3, 2005 conference call, and in Universal American's second quarter Form 10-Q, were materially false and misleading and were know by defendants to be false at that time or were recklessly disregarded as such, for the reasons stated in ¶ 25, *supra*.

41.    Taking full advantage of the artificial inflation in the price of Universal American shares, caused in substantial part by publication and dissemination of defendants' materially false and misleading information about the Company, between June 1, 2005 and October 3, 2005,

Universal American insiders sold more than $119 million of their personally held Company stock while in possession of materially false and misleading information.

| Date | Defendant | Shares Sold | Proceeds ($) |
|---|---|---|---|
| 06/01/05-10/03/05 | Richard Barasch, CEO | 160,000 | $3.2 million |
| 09/01/05-09/12/05 | Gary Bryant, VP/COO | 120,000 | $2.7 million |
| 09/01/05-09/07/05 | Robert Waegelein, CFO | 60,000 | $1.3 million |
| 06/22/05 | Capital Z Partners | 5,000,000 | $112 million |

**TOTAL:    5,340,000    $119.2 million**

42.    The Class Action Complaint alleges that during the Class Period, Universal American insiders sold more than 5.5 million of personally held Company stock, for total proceeds exceeding $122 million.

## THE TRUTH BEGINS TO EMERGE

43.    The Class Action alleges that the truth began to emerge on October 28, 2005, less than one month after Company insiders had liquidated over $119 million of their personally held Universal American shares. Defendants shocked investors by issuing a press release that revealed financial and operational results were well below analysts' expectations.

44.    The Company announced that its medical loss ratio for the third quarter was approximately 290 basis points higher that it anticipated. As a result, the Company revised its estimate of the medical loss ratio for the full year 2005 to approximately 72 percent around 200 basis points higher than its previous estimates.

45.    Following this announcement, shares of Universal American fell over $7.50 per share or 33 percent, in regular trading on the NASDAQ to close at $14.17 per share.

## DERIVATIVE ALLEGATIONS

46.    Plaintiff brings this action as a derivative action pursuant to Federal Rules of Civil Procedure 23.1 on behalf of and for the benefit of Universal American.

47.    Plaintiff will fairly and adequately represent the interests of Universal American in enforcing and prosecuting its rights, and has retained competent counsel experienced in this type of litigation to prosecute this action.

## DEMAND IS EXCUSED FOR FUTILITY

48.    Demand on Universal American to bring this action has not been made and is not necessary because such demand would be futile.  The current Board of Universal American consists of the following nine Directors: Barasch, Cooper, Harmeling, Harnett, Lamel, Leathers, McLaughlin, Spass and Wright. Directors Barasch, Harnett, Cooper, Leathers and Spass, who constitute a majority of the nine-member Board, are interested and any demand upon them is futile.  Accordingly, plaintiff has not made any demand on the present Board of Universal American to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the reasons listed below.

49.    Defendant Barasch is not in a position to exercise independent business judgment with respect to the claims alleged herein because he is an officer of the Company and is interested in the events herein.   The Universal American Board has acknowledged that Defendant Barasch is not independent in its 2005 Proxy Statement.  Further, according to the Class Action Complaint, defendant Barasch engaged in improper insider trading activities during the Class Period.  Defendant Barasch sold 220,000 of his personally held Universal American stock for the proceeds in excess of $4.2 million.  Because defendant Barasch has interest in the events herein and has received a personal financial benefit from the challenged insider trading

16

transactions, there is reasonable doubt that he could fairly assess the propriety of a pre-suit demand, when such inquiry would cause defendant Barasch to face a substantial threat of liability for his own insider selling of the Company's shares. Since defendant Barasch has breached his fiduciary duty and is interested, any demand upon him is futile.

50.    The Universal American Board has acknowledged that Defendant Harnett is not independent in its 2005 Proxy Statement. Director Harnett derives a personal financial benefit from the Company.  Defendant Harnett is a shareholder in the law firm of Harnett, Lesnick & Ripps, P.A. of Boca Raton, Florida, which provides legal services to the Company.  Accordingly, Director Harnett is incapable of impartially considering a pre-suit demand to commence and vigorously prosecute this action against his fellow Board members, since such action would jeopardize the on-going business relationship that his law firm has with Universal American. Thus, demand on Director Harnett is futile.

51.    Directors Cooper, Leathers and Spass are not in a position to exercise independent business judgment with respect to the claims alleged herein due to Capital Z's improper insider trading activities.  These Directors are Capital Z's appointees to the Board.  Capital Z is Universal American's largest shareholder, holding approximately 34.9 percent of the Company's outstanding common stock.  Director Cooper is a Senior Vice President, Director, Partner and co-founder of Capital Z.  Director Leathers is a Principal of Capital Z.  Director Spass is the Chairman of the Board, a Partner and co-founder of Capital Z.  During the Class Period, Capital Z sold 5,000,000 Universal American shares in the Company's June 6, 2005 Offering, for proceeds exceeding $112 million.  Because Directors Cooper, Leathers and Spass received personal financial benefits from the challenged insider trading transactions, there is reasonable doubt that they could fairly assess the propriety of a pre-suit demand, when such inquiry would

cause them to face a substantial threat of liability for their own insider selling of Universal American shares.

52.    The Universal American Board has pre-judged this matter. On November 29, 2005, Universal American issued a press release announcing that a purported class action lawsuit was filed. The Company issued the following statement:

> ***Universal American has reviewed the allegations contained in the complaint and believes that they are without merit.*** Universal American intends to vigorously defend itself against the complaint. Universal American also noted that several additional law firms have announced the commencement of actions on behalf of shareholders that are believed to be similar in substance. [emphasis supplied].

Since the Universal American Board has determined that the allegation of the Class Action are meritless, the Directors could not fairly decide to institute suit against the Defendants here, because they have pre-judged the matter. Therefore, reasonable doubt exists as to all Board members because they have pre judged this matter and are not in position to fairly asses the propriety of a pre-suit demand.

53.    Among the additional facts demonstrating the futility of a pre-suit demand are the following:

a.    Universal American is and was controlled by its Board of Directors and, as described herein, the Individual Defendants were involved in the wrongs alleged and are ultimately responsible for the Company's financial reporting. These wrongs have given rise to the Class Actions, in which open market purchasers of Universal American stock have sued the Company and certain of the directors and/or officers asserting claims under the federal securities laws. None of the Directors is in a position to exercise independent business judgment with respect to the claims alleged herein due to his/her participation in and responsibility for the

conduct giving rise to the Class Actions, which have damaged and will continue to damage Universal American.

b.     Any suit by the current directors of Universal American to remedy these wrongs would likely expose the Individual Defendants and the Company to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

c.     Universal American has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Universal American any part of the damages it suffered and will suffer thereby.

d.     If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants. In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions. This they will not do. Thus, demand is futile.

e.     Universal American's current and past officers and directors are insured against personal liability for their various acts as alleged in this Complaint by directors' and officers' liability insurance.  However, a suit authorized by Universal American Board on

behalf of the Company against the Board, its directors or officers would not be covered by the insurance, wherein a suit by a shareholder derivatively on behalf of the Company would be covered by the insurance. Accordingly, the directors are conflicted and have no impetus to institute suit where the net result would be to vitiate insurance they now possess.

54.    Based on the foregoing, a majority of the members of the Company's Board of Directors, due to their potential individual financial exposure, are not disinterested and cannot exercise independent business judgment on the issue of whether Universal American should prosecute this action. As a result, demand on Universal American and its Board of Directors is futile and therefore excused.

## FIRST CAUSE OF ACTION
### (Against Individual Defendants for Contribution Pursuant to Sections 10(b) and 21D of the Exchange Act)

55.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

56.    Defendants had a duty not to defraud the investing public by the dissemination of materially false and misleading press releases and the dissemination of materially false and misleading financial information and projections.

57.    The Individual Defendants have been sued in the Class Action alleging that the Individual Defendants caused the Company to issue false and misleading statements as alleged above and, as a result, the Company and these defendants violated Section 10(b) of the Exchange Act.

58.    It is alleged in the Class Action that the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in

20

the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Universal American, their control over, and/or receipt and/or modification of Universal American's allegedly materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning Universal American, participated in the fraudulent scheme alleged herein.

59.     These Individual Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.   The ongoing alleged fraudulent scheme alleged in the Class Action could not have been perpetrated over a substantial period of time without the knowledge and complicity of the personnel at the highest level of the Company, including these Individual Defendants.

60.     During the Class Period, it is alleged in the Class Action that the Individual Defendants carried out a plan, scheme and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) enabled defendants to register for sale with the SEC, millions of shares of their privately held Company stock; (iii) enabled Universal American and certain Company insiders to sell approximately $122 million of their privately held Universal American shares while in possession of material adverse non-public information about the Company; and (iii) caused plaintiff and other members of the Class to purchase Universal American common

stock at artificially inflated prices. As alleged in the Class Action, these defendants: : (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Universal American's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. These defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

61.    In addition to the duties of full disclosure imposed on these defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to disseminate truthful information promptly that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including  accurate and truthful information with respect to the Company's business, so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

62.    It is alleged in the Class Action that these defendants, individually and in concert, directly and indirectly, by the use of the mails or other means or instrumentalities of interstate commerce, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, and future prospects of Universal American as specified  herein.  These defendants are alleged to have employed devices, schemes and artifices to defraud, while in possession of material

22

adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Universal American's value and future profitability. This included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Universal American and its business, operations and future prospects, in the light of the circumstances under which they were made, not misleading, and engaging in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Universal American securities during the Class Period.

63.    As alleged in the Class Action, as a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Universal American's securities was artificially inflated during the Class Period.    Unaware of the fact that the market price of Universal American's shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by these defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by these defendants but not disclosed in public statements during the Class Period, Class members acquired Universal American's securities during the Class Period at artificially high prices and were damaged thereby.

64.    As alleged in the Class Action, at the time of said misrepresentations and omissions, the Class members were unaware of their falsity, and believed them to be true. Had the members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Universal American, which were not disclosed by these defendants, members of the Class would not have purchased or

otherwise acquired their Universal American securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

65.    As alleged in the Class Action, by virtue of the foregoing, these Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5.

66.    It is further alleged in the Class Action that the Company participated in the wrongful conduct and is equally liable for violation of Section 10(b) of the Exchange Act. Assuming that the Company is liable, these Individual Defendants caused the Company to violate Section 10(b) of the Exchange Act, and incur liability for damages for violation of the federal securities laws.

67.    If the Company is deemed to have violated the federal securities laws, and incurs damages therefore, these Individual Defendants are liable to the Company for contribution pursuant to sections 10(b) and 21(D) of the Exchange Act.

## SECOND CAUSE OF ACTION
### (Against all Individual Defendants for Breach of Fiduciary Duty)

68.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

69.    The Individual Defendants owed and owe Universal American fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Universal American the highest obligations of good faith, fair dealing, loyalty and due care.

70.    These defendants breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

71.    Each of the defendants had actual or constructive knowledge that they had caused Universal American to improperly misrepresent the business and prospects of the Company. These actions could not have been a good faith exercise of prudent business judgment. Moreover, certain of the Individual Defendants are asserted to have engaged in the actions alleged in the Class Action, which would be a breach of their duty to conduct the business of the Company only through lawful and proper means.

72.    As a direct and proximate result of the Individual Defendants' misconduct, Universal American has suffered and will continue to suffer significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

<div align="center">

**THIRD CAUSE OF ACTION**
**(Against the Insider Selling Defendants**
**for Breach of Fiduciary Duties for Insider Selling**
**and Misappropriation of Information)**

</div>

73.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though, fully set herein.

74.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Universal American common stock on the basis of such information. Collectively, they sold millions of their personally held stock.

75.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which these defendants used for their own benefit when they sold Universal American common stock.

<div align="center">

**FOURTH CAUSE OF ACTION**
**(Against All Individual Defendants for Breach of the Duty**
**of Full Disclosure and Complete Candor)**

</div>

<div align="center">25</div>

76.    Plaintiff incorporates by reference all previous allegations.

77.    Whenever directors communicate publicly or directly with shareholders about the corporation's affairs, with or without a request for shareholder action, directors have a fiduciary duty to shareholders to exercise due care, good faith and loyalty. When directors communicate publicly or directly with shareholders about corporate matters the *sine qua non* of directors' fiduciary duty to shareholders is honesty.  Moreover, a fiduciary who learns that her earlier communications to her beneficiaries were false and nonetheless knowingly and in bad faith remains silent even as the beneficiaries continue to rely on those earlier statements also breaches his duty of loyalty and of full and fair disclosure.

78.    Each of the Individual Defendants has breached his/her duty of full disclosure and complete candor by knowingly and/or recklessly disregarding the falsity and misleading nature of the information which they caused it to be disseminated to the investing public.

79.    In addition to the duties of full disclosure imposed on the Individual Defendants as a result of their making affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to disseminate truthful information promptly that would be material to investors in compliance with the integrated disclosure provisions of the SEC regulations, including accurate and truthful information with respect to the Company's business, so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

80.    As a direct and proximate result of the Individual Defendants' breach of full disclosure and complete candor, Universal American has sustained significant damages arising out of the alleged material misstatements to the investing public, and Individual Defendants are

26

liable to the Company.

## FIFTH CAUSE OF ACTION
### (Against All Individual Defendants
### for Return of Unearned Compensation)

81.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

82.     In 2004, the Compensation Committee elected to award bonuses to Defendants Barasch, Waegelein and Bryant in the amount of $1.3 million, $335,000 and $300,000, respectively. The Compensation Committee determined that these amounts were appropriate given the Company's financial performance and the contribution made by the three defendants to the Company's performance.

83.     By reason of their positions as directors and/or officers of the Company, the Individual Defendants owed a fiduciary duty to the Company and its shareholders in connection with the operations, management, and direction of the Company.

84.     Defendants Barasch, Waegelein and Bryant should be required to forfeit to the Company all bonuses, other incentive-based or equity-based compensation received during the Class Period, because pursuant to their specific duties, each was charged with the management of the Company and to conduct its business affairs. Each of the above referenced defendants breached the fiduciary duties that they owed to Universal American and its shareholders in that they failed to prevent and correct the improper statements. As a result, Universal American has been and will continue to be exposed to significant losses due to

the wrongdoing complained of herein. Accordingly, Defendants Barasch, Waegelein and Bryant are liable to the Company and should return all of their unearned compensation.

## SIXTH CAUSE OF ACTION
### (Against All Individual Defendants for Breach of Fiduciary Duty, Unjust Enrichment, and Abuse of Control)

85.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

86.    The defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Universal American, for which they are legally responsible. Moreover, defendants received substantial cash and non-cash payments and compensation from the Company and sold a large number of Universal American shares during the Class Period while in possession of material, non-public information. The Individual Defendants thus are required to disgorge to the Company all payments and compensation that they received while in possession of material, nonpublic information about the Company.

87.    As a direct and proximate result of the Defendants' abuse of control, Universal American has sustained significant damages, and Defendants are liable to the Company.

## SEVENTH CAUSE OF ACTION
### (Against All Individual Defendants for Breach of Fiduciary Duty Through Mismanagement)

88.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

89.    By their actions alleged herein, the Individual Defendants, either directly or

through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Universal American in a manner consistent with the operations of a publicly held corporation.

90.    As a direct and proximate result of the Individual Defendants' gross mismanagement, Universal American has sustained significant damages arising out of the alleged material misstatements to the investing public and damages to the Company arising from the pendency of the Class Action. The Individual Defendants are liable to the Company for all damages flowing therefrom, including the obligations for common law contribution.

## JURY DEMAND

91.    Plaintiff demands a trial by jury.


## PRAYER FOR RELIEF


**WHEREFORE**, plaintiff prays for judgment as follows:

A.    Against the Individual Defendants for contribution pursuant to Sections 10(b) and 21(D) of the Exchange Act;

B.    Against all of the Individual Defendants for the damages sustained by Universal American as a result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

C.    Equitable and/or injunctive relief as permitted by law;

D.    Restitution and disgorgement of unjust enrichment;

E.    Attorneys fees and costs; and

F.     Any such other and further relief as may be just and proper.


Dated:   New York, New York
           December 12, 2005


                         ROY JACOBS & ASSOCIATES

By: _____
                      Roy L. Jacobs (RLJ 0286)

                      60 East 42nd Street 45th Floor
                      New York, NY 10165
                      Tel. (212) 867-1156
                      Fax (212) 504-8243

                      rljacobs@pipeline.com

                      Laurence D. Paskowitz
                      PASKOWITZ & ASSOCIATES
                      60 East 42nd Street—46th Floor
                      New York, NY 10165
                      Tel. (212) 685-0969
                      Fax (212) 685-2306

                      classattorney@aol.com

                      *Attorneys for Plaintiff*

30

## VERIFICATION

Roy L. Jacobs, declares under penalty of perjury this 11th day of December, 2005 as follows:

1.    I am one of the counsel in the foregoing action.

2.    I have read the Complaint, and I believe the allegations contained in it are true, to the best of my knowledge and belief.

_____
Roy L. Jacobs