UNITED STATES DISTRIC COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
GREEN MEADOWS PARTNERS  derivatively
on behalf of the Nominal Defendant,

                    Plaintiff,

--against --

RICHARD A. BARASCH, ROBERT A.
WAEGELEIN,  GARY W. BRYANT,
WILLIAM E. WEHNER, BRADLEY E.
COOPER, ROBERT A. SPASS, ERIC W.
LEATHERS and CAPITAL Z FINANCIAL
SERVICES FUND, II, L.P.,

                    Defendants,

         --and--


UNIVERSAL AMERICAN FINANCIAL CORP.,

           Nominal Defendant.

-----------------------------------------------------------------x

**Civil Action No.:  05 Civ. 10445 (JFK)**

**VERIFIED AMENDED
SHAREHOLDER'S DERIVATIVE
COMPLAINT**

**ECF FILED**

**JURY TRIAL DEMANDED**

Plaintiff, by its attorneys, submits this shareholder's derivative complaint against the defendants named herein.  The allegations are asserted on information and belief after due investigation of counsel, except as to those matters which relate to plaintiff and its own acts, which are asserted on personal knowledge.

## NATURE OF THE ACTION

1.      This is a shareholder's derivative action brought on behalf of nominal defendant Universal American Financial Corp. ("Universal American" or the "Company"), a New York corporation with headquarters and principal place of business at Six International Drive, Rye Brook, New York.  In this action, plaintiff alleges that the defendants, officers and/or directors of the Company breached their fiduciary duties by issuing materially false and misleading information to the investing public regarding the Company's projected medical loss ratio for the 2005 fiscal year.  The medical loss ratio is a very closely watched metric that is an expression of the relationship of the cost of health care provided to premium income.  An increase in the medical loss ratio means higher expenses relative to premium income, which in turn indicates that the Company is becoming less profitable. This Complaint also alleges that the Company's largest shareholder was unjustly enriched through certain stock sales made at artificially inflated prices.

2.      On or about November 22, 2005, a securities class action entitled *Kemp v. Universal American Financial Corp. et al.*, Civil Action No. 05 Civ. 9883 (JFK) (S.D.N.Y.), was filed against the Company and defendants Richard A. Barasch, Robert A. Waegelein, William E. Wehner and Gary W. Bryant (the "Class Action Individual Defendants") alleging violations of the Securities Exchange Act of 1934  (the "Exchange Act") (hereinafter referred to as the "Class Action"). The class action complaint (the "Class Action Complaint") filed June 26, 2006, asserts claims on behalf of purchasers of the securities of Universal American between February 16, 2005 and October 28, 2005, inclusive (the "Class Period").

3.      According to the Class Action Complaint, the Class Action Individual Defendants' scheme: (i) deceived the investing public regarding Universal American's business,

operations, and management; (ii) enabled Universal American and Capital Z Financial Services Fund, II, L.P. ("Capital Z") to sell more than 7 million Universal American shares during the time that Universal American shares were artificially inflated; and (iii) caused the Class to purchase Universal American common stock at artificially inflated prices.

4.    Universal American is a specialty health and life insurance holding company. Through its family of companies, Universal American offers a broad array of health insurance and managed care products and services to the growing senior population.   The Class Action Complaint alleges that the Class Action Individual Defendants' Class Period representations regarding Universal American were materially false and misleading when made, for the following reasons:

a.    The rate at which the Company's medical expenses were rising relative to premium income was much greater than reported;

b.    The Company's financial statements were not in compliance with GAAP and SEC rules because these Defendants had not disclosed all trends, conditions and adverse factors adversely affecting the Company throughout the Class Period; and

c.    These Defendants lacked any reasonable basis to claim that if Universal American was operating according to plan, Universal American could achieve guidance sponsored and/or endorsed by defendants.

5.    The Class Action Complaint alleges that the truth began to emerge on October 28, 2005, when Universal American announced its financial results for the third quarter ended September 30, 2005. The Company announced that the Medicare Supplement loss ratio for the third quarter was 71.9%, approximately ***290 basis points higher*** than Universal American's third quarter target.    Following this announcement, shares of Universal American fell 33 percent in

regular trading.

6.      According to the Class Action Complaint, each of the Class Action Individual Defendants knew and/or recklessly disregarded numerous false or misleading statements made during the Class Period regarding Universal American's estimate of its 2005 medical loss ratio. Each of these defendants was an active participant in the wrongdoing alleged and/or profited substantially from insider trading during the Class Period.

7.      As a result, Universal American has been severely damaged by the wrongdoing alleged herein.  The Class Action Individual Defendants,  by acting in breach of their fiduciary duties, have exposed the Company to massive liability under the federal securities laws and have severely damaged Universal American's reputation in the securities markets.  It would be unfair and inequitable for the shareholders of Universal American to bear the direct or indirect burden to pay these damages caused by the defendants, and therefore, plaintiff seeks to require the defendants to make recompense to the Company.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C 1331 (federal question jurisdiction) insofar as this action arises under both Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. 78j(b), pursuant to which there is a private right of action for contribution, and Section 21D of the Private Securities Litigation Reform Act, 15 U.S.C.  78u-4, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.  Prior to Congress having enacted an express provision for contribution under Section 21D of the Exchange Act, the United States Supreme Court recognized that a federal cause of action existed for contribution pursuant to Section 10(b) of the Exchange Act and Rule 10b-5.  *See Musick, Peeler & Garrnett v. Employers Insurance of*

*Wausau,* 508 U.S. 286 (1993). Thus, pursuant to federal statutory law and Supreme Court authority, this Court has original federal question jurisdiction over the Federal contribution claim alleged herein. This Court also has subject matter jurisdiction over the pendent state law claims asserted herein pursuant to 28 U.S.C. 1367 (supplemental jurisdiction), since this statute provides that the district court has supplemental jurisdiction over all other claims where, as here, they are so related to claims in the action within the original jurisdiction of the Court, that they form part of the same case or controversy.

9. This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

10. Venue is proper in this judicial district pursuant to 28 U.S.C. 1391(b). A number of the wrongful acts and practices contained of herein occurred in this District. Nominal defendant Universal American maintains its headquarters in this District.

11. In connection with the violations of law alleged herein, the defendants used the means and instrumentalities of interstate commerce including the United States mail, interstate wire and telephone facilities, the facilities of the national securities markets and the Internet to distribute the false and misleading statements complained of herein.

## PARTIES

12. Plaintiff Green Meadows Partners, ("plaintiff") is, and was at all relevant times, a shareholder of nominal defendant Universal American.

13. Defendant Richard A. Barasch ("Barasch") has served as a Director of the Company since 1988, as Chairman of the Board since December 1997, as Chief Executive Officer since June 1995 and as President since April 1991. In 2005 he was paid $764,909 in salary, a bonus of $803,154 and $150,000 in Restricted Stock Awards. During the Class Period,

while in possession of materially adverse and undisclosed information about the Company, Defendant Barasch sold 160,000 shares of his personally-owned stock at artificially inflated prices, for gross proceeds of $3.24 million. Pursuant to a Shareholders Agreement dated June 30, 1999 among Universal American, Capital Z, Richard Barasch and others (the "Shareholders Agreement"), Defendant Barasch has the right to designate two directors to the Universal American Board, and Capital Z has the obligation to vote its shares to elect them. Defendant Barasch has designated himself and Bertram Hartnett as his Directors.

14.    Defendant Robert A. Waegelein ("Waegelein") has served as Executive Vice President and Chief Financial Officer of the Company since October 1990.  In 2005 he was paid $340,000 in salary, a bonus of $178,500 and $150,000 in Restricted Stock Awards.  During the Class Period, while in possession of materially adverse and undisclosed information about the Company, Defendant Waegelein sold 60,000 shares of his personally-owned shares at artificially inflated prices, for gross proceeds of $1.37 million

15.    Defendant Gary W. Bryant ("Bryant") has served as Executive Vice President for the Company since June 1995 and Chief Operating Officer of the Company since June 2000.   In 2005 he was paid $390,000 in salary, a bonus of $204,750 and $150,000 in Restricted Stock Awards. During the Class Period, while in possession of materially adverse and undisclosed information about the Company, Defendant Bryant sold 120,000 shares of his personally-owned shares at artificially inflated prices, for gross proceeds of $2.74 million

16.    Defendant William E. Wehner served as a director and President of Pennsylvania Life Insurance Company, a Subsidiary of Universal American from April 2000.  During the Class Period, while in possession of materially adverse and undisclosed information about the

6

Company, Defendant Wehner sold 150,000 shares of his personally-owned shares at artificially inflated prices, for gross proceeds of $2.63 million.

17.    Defendant Capital Z is a private investment partnership with offices in New York. It is the Company's largest shareholder, currently owning 34.9 percent of its outstanding shares. In the secondary stock offering on or about June 16, 2005, (the "Secondary Offering") it sold approximately 5 million shares at a price of $23.61 realizing over $112 million in proceeds.

18.    Defendant Bradley E. Cooper has served as a Director of the Company since July 1999. He serves as a member of the Company's Executive Committee and did so in 2005. Defendant Cooper is a Senior Vice President, Director, Partner and co-founder of Capital Z.  He is a designated director by Capital Z in accordance with the Shareholders Agreement.  Pursuant to that Agreement, Defendant Barasch is obligated to vote for Capital Z's Board nominees. Defendant Cooper currently serves on the board of directors of CERES Group, Inc., along with Defendant Robert A. Spass. CERES is believed to be another company affiliated or once affiliated with Capital Z.  The Capital Z website describes Defendant Cooper in part as follows: "With the other Founding Partners, Mr. Cooper shares ultimate responsibility for the oversight of all investment and monitoring activities, with a particular focus on investments in the insurance and insurance services sectors. He currently serves as a director of several portfolio companies of Capital Z and IP [Insurance Partners]."

19.    Defendant Robert A. Spass ("Spass") has served as a Director of the Company since July 1999. He is a Capital Z designated Director. He serves as Chairman of the Company's Executive Committee and did so in 2005.  Defendant Spass is the chairman of the board, a partner and co-founder of Capital Z.  Defendant  Spass serves on the board of directors of CERES Group, Inc.   The Capital Z website describes defendant Spass in part as follows: "With

7

the other Founding Partners, Mr. Spass shares ultimate responsibility for the oversight of all investment and monitoring activities. He currently serves as a director of several portfolio companies of Capital Z and IP."

20.    Defendant Eric W. Leathers ("Leathers") has served as a Director of the Company since February 2004. He is a Capital Z designated Director. He is a Principal of Capital Z. The Capital Z website describes defendant Leathers in part as follows: "Eric W. Leathers is a Partner of Capital Z Financial Services Partners, and is focused primarily on investments in the insurance, reinsurance, and insurance services industries."

21.    Defendants Cooper, Spass and Leathers are sometimes referred to as the Capital Z Individual Defendants.

22.    The Individual Class Action Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Universal American's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each such Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and/or had free and unfettered access to same, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them but not to the public, each of these Individual Defendants knew that the adverse facts specified herein, as alleged in the Class Action Complaint, had not been disclosed to and were being concealed from the public and that the positive representations being made were materially false and misleading.  The Class Action Complaint alleges that certain of the Individual Defendants are liable under the federal securities laws for the false statements pleaded herein, as those statements were each "group-published"

8

information, the result of the collective actions of the Individual Defendants.

23. The Capital Z Individual Defendants did not insure that the Company's financial pronouncements were accurate prior to allowing Capital Z to sell shares in the Secondary Offering. As such, they breached their fiduciary duty and are liable to the Company for contribution. Capital Z profited substantially from its sale of 5 million Universal American shares in the Offering, receiving proceeds which constituted seven times its original cost for those shares. Meanwhile, the Company is now allegedly liable for securities fraud in connection with that sale and/or trading of those shares. It is inequitable and unreasonable for Capital Z to retain the profits on the sale because such would be at the expense of the Company.

24. Nominal Defendant Universal, through its subsidiaries, offers life, accident, and health insurance, and annuities in the United States, the District of Columbia, Puerto Rico, and Canada. The Company primarily sells Medicare Supplement and Medicare Select, fixed benefit accident and sickness disability insurance, senior life insurance, and fixed annuities.

## THE MISSTATEMENTS AND OMISSIONS OF MATERIAL FACT IN VIOLATION OF THE SECURITIES EXHANGE ACT ALLEGED IN THE CLASS ACTION

25. The allegations in this section summarize the essential allegations of the Class Action Complaint.

26. Universal American's principal health insurance products for the senior market are Medicare Supplement and Medicare Advantage. Universal American also sells specialty health insurance to self-employed individuals in the United States and Canada, as well as life insurance and fixed annuities. The Company distributes these products through a career agency system and an independent general agency system. It also provides administrative services for senior market insurance and non-insurance programs to both affiliated and unaffiliated insurance

9

companies.   Collectively, the Company's insurance subsidiaries are licensed to sell health insurance and life insurance in all 50 states, the District of Columbia, Puerto Rico and all the provinces of Canada. Its managed care subsidiary operates Medicare Advantage health plans in Texas, New York and Pennsylvania, as well as other locations.  Universal American has more than 1,200 employees in four main locations. The company is traded on the NASD National Market system under the ticker symbol "UHCO."

27.     Because of the Class Action Individual Defendants' positions with the Company, they had access to adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

28.      As officers and controlling persons of a publicly-held company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and whose common stock was and is traded on the NASDAQ National Market (the "NASDAQ"), and governed by the provisions of the federal securities laws, the Class Action Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.

The Class Action Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

29.    The Class Action Individual Defendants participated in the drafting, preparation, and/or approval of the various public shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Universal, each of the Individual Defendants had access to the adverse undisclosed information about Universal American's  business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Universal American and its business issued or adopted by the Company materially false and misleading.

30.    The Class Action Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each such Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Class Action Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

31.    Each of these Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Universal American

securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Universal American's business, operations, management and the intrinsic value of Universal American securities; (ii) enabled Capital Z to sell approximately 5 million shares of Universal American common stock for gross proceeds in excess of $112 million; (iii) enabled the Company to sell 2 million shares of its stock to the public (plus an over-allotment) in the  Secondary Offering at an artificially inflated price of $23.61 per share; and (iv) caused the Class to purchase Universal American securities at artificially inflated prices.

## CONFIDENTIAL SOURCES

32.     The allegations made in the Class Action Complaint are made upon information and belief and are supported by the first-hand knowledge of six (6) confidential witnesses ("CW"s). These witnesses are comprised of former employees and/or agents of the Company and/or its subsidiaries, each of whom was employed during the Class Period (unless otherwise indicated) and provided facts from various areas of the Company's businesses.

33.     Confidential Witness 1 ("CW-1") is a former Senior Sales Manager at a subsidiary of Universal American, who served in that position from before the start of the Class Period until July 2005. CW-1 was present at a meeting at the Orlando Marriott in Lake Mary, FL between January 18-21, 2005 held by Defendants Barasch, Bryant and Wehner, among others (the "January 2005 Meeting").

34.     Confidential Witness 2 ("CW-2") is a former Senior Solutions Sales Center Manager, who served in that position until December 2005. CW-2 attended a meeting in early 2005 with senior executives of Universal American.

35. Confidential Witness 3 ("CW-3") is a former agent of one or more of the Company's

subsidiaries who served in that position from before the start of the Class Period through December 2005.

36.    Confidential Witness 4 ("CW-4") is a former Regional Manager of a subsidiary of Universal American. CW-4 served at that position from before the start of the Class Period until September 2005. CW-4 was present at a meeting in Florida in early 2005 that was attended by Defendant Bryant, among others.

37.    Confidential Witness 5 ("CW-5") is a former Regional Vice President of a subsidiary of Universal American, whose role was to recruit and train agency managers and agents. CW-5 served at that position from before the start of the Class Period until October 2005.

38.    Confidential Witness 6 ("CW-6") is a former Senior Solutions Sales Center Manager at a subsidiary of Universal, who served in that position from before the start of the Class Period until August 2005. CW-6 was present at the January 2005 Meeting. CW-6 also participated in another meeting in Lake Mary, FL in May 2005 that was attended by Defendant Wehner, among others.

## SUBSTANTIVE ALLEGATIONS

### The Company And Its Business

39.    Universal American, through its subsidiaries, provides various health insurance and managed care products and services to the senior population in the United States, the District of Columbia, Puerto Rico, and Canada. The Company's principal health insurance products for the senior market are Medicare Supplement and Medicare Advantage (hereinafter referred to as "Medicare Business"). Universal American offers Medicare Supplement and Medicare Advantage through its operating subsidiaries, including, for example, Pyramid Life Insurance Company ("Pyramid Life") and Heritage Health Systems, Inc. ("Heritage").

13

40.    Medicare Supplement is voluntary private insurance coverage purchased by Medicare enrollees to cover the cost of services not reimbursed by Medicare. In other words, it is an insurance policy that covers Medicare co-payments and other services. People who choose to buy Medicare Supplement policies must pay a monthly premium to the private insurance company that sold them the policy. In general, and in accordance with Federal and National Association of Insurance Commissioners model regulations, Medicare Supplement policies are sold in plans labeled A through L. Each lettered plan offers a different set of benefits. For example, Plan A covers only the most basic benefits, while Plans B through J offer additional benefits. Plans K and L, which became available in 2005, have a separate set of basic benefits that differ from Plans A through J. Costs for these plans vary based on factors such as which plan is being offered and the insurance company selling the plan.

41.    Medicare Advantage plans (previously called "Medicare + Choice Plans") are health plans offered by private companies through Medicare. Specifically, Medicare Advantage is a Medicare program that is available to anyone who has Medicare Parts A and B, but provides the customer with greater choices among health plans. Most Medicare Advantage plans offer a broader spectrum of benefits than standard or basic Medicare. People who join a Medicare Advantage plan do not need Medicare Supplement insurance.

42.    The Company's business has grown, in part, through acquisitions. In 2003, Universal American acquired Pyramid Life, which provides health and life insurance products to the senior market including Medicare Supplement, long-term care, life insurance, and annuities. In May 2004, Universal American acquired Heritage Health Systems, Inc., which was previously a privately-owned managed-care company that operates in the Medicare market in Texas.

14

According to the Company, these acquisitions were intended to add efficiencies to Universal American's expanding senior market operations.

43.    As required by certain state regulations, Defendants paid close attention to numerous metrics and factors that indicated the strength and performance of Universal American's Medicare businesses.

44.    In this regard, these Defendants closely monitored the Company's medical loss ratio ("MLR") for its Medicare Business. MLR is a key economic metric used by companies in the insurance industry to measure the ratio of a company's expenses of providing healthcare services to the premiums it receives. The MLR is a significant indicator of a company's performance in a line of insurance since any increase in this ratio is evidence of rising expenses without a comparable rise in premiums received.

45.    Aside from the MLR, these Defendants paid close attention to the level of Lapsation and Rollover the Company was experiencing, or expected to incur, because these factors were also prime indicators of the financial performance of the Company's Medicare Business. "Lapsation," is the termination of an insurance policy due to non-payment of premiums. Lapsation can occur voluntarily when a customer no longer pays premiums because they decide that they no longer want to maintain their current policy. "Rollover" or "business rolling" is a term used to describe the departure of sales agents, often with their blocks of business, to other insurance companies. Rollover frequently leads to increased levels of Lapsation as sales agents leave a company, take their clients with them and those clients stop paying their premiums.

46.    The issues of Lapsation and Rollover were of particular importance in Universal American's Medicare Business as the Medicare insurance market is highly competitive. The core product –Medicare – is the federal health insurance program for people 65 years of age or

15

older; certain younger people with disabilities; and people with End-Stage Renal Disease (permanent kidney failure with dialysis or a transplant). The benefits offered through such plans are virtually identical from one company to another. Thus, there is little that companies can do to differentiate their products from one another other than price and service. This requires that companies maintain tight margins and provide the best service they can or risk losing customers to competitors. Given these characteristics, it is critically important that the Company maintain a good sales force that has strong ties to their clients as it is often these relationships that help ensure that customers keep their insurance at Universal American, as opposed to changing to another company.

**The Class Action Individual Defendants Misrepresented The True Condition Of Universal American's Medicare Business And Failed To Disclose Numerous Adverse Factors Were Impacting Universal American's Business**

47. By the start of the Class Period, Universal American was experiencing a steep decline in its Medicare Business as its MLR was steadily increasing. In recognition of this adverse trend, in early 2005 (and by no later than April 2005), Universal American applied with the Departments of Insurance in certain of the states in which it conducts business for a rate increase in its Medicare Business. The Company's application was highly unusual as it had just implemented a rate increase in January 2005 and insurance companies offering Medicare do not generally raise rates more than once a year. In its application for the rate increase, which was not readily available to the public, Universal American detailed the condition of its business in an effort to justify the requested rate increase.

48. The Class Action Individual Defendants advised the market that Universal American had applied for a rate increase but failed to disclose that the deterioration in its business was so severe that it had applied for a rate increase that was 40% more than the increase the market expected. As detailed further herein, Defendants were motivated to conceal the

magnitude of Universal American's requested (and planned) rate increase in order to delay the inevitable Rollover and Lapsation (and concomitant decline in revenue and increase in MLR) that would occur as soon as the rate increase was made publicly known and in order to permit its majority shareholder, Capital Z, to sell more than 5 million shares at $23.61 the Secondary Offering.

49.   Universal American needed to significantly raise its rates in an effort to reverse its negative MLR trend. As detailed herein, throughout the Class Period, the Class Action Individual Defendants represented that Universal American's MLR was increasing due to "seasonality." In truth, and in fact, the rising MLR was primarily due to an increasing level of claims (expenses) and not only due to "seasonal" factors. Numerous former employees of the Company have detailed the true internal condition of the Company and have recounted that, throughout the Class Period, Universal American was experiencing an increasing rate of claims which was causing the Company's MLR to rise and that the Company would need to implement further rate increases:

a.   According to CW- 1, a former Senior Sales Manager at a subsidiary of Universal American, Universal American senior executives, including Defendants Barasch, Bryant and Wehner, conducted a meeting on January 18-21, 2005 at the Orlando Marriott in Lake Mary, Florida, that was attended by approximately 12 managers. At the meeting, CW-1 was told that despite the Company's rate increase only three weeks earlier on January 1, 2005, there were already plans to implement further rate increases during 2005. CW-1 stated that the Company's chief actuary "said they were going to have a big rate increase." Overall, CW-1 stated, "It was a bad news meeting" and we were told that changes would have to be made because the Company's *"loss ratio is so terrible."* According to CW-1, "[Universal] knew that

the loss ratio was going to go way up because of [the rate increases] – they're not stupid." Moreover, according to CW- 1, the Company's sales managers were also shown a PowerPoint presentation in which the Company's MLR was significantly higher than the MLR disclosed to the public in the Company's financial reports.

b.      According to CW-2, a former Senior Solutions Sales Center Manager at one of the Company's subsidiaries, at a meeting in Florida in early 2005, senior management told "us that the claims losses were just horrendous" and that "the claims losses were higher – we're going to have big rate increases."

c.      According to CW-3, a former agent at the Company's subsidiaries, in May 2005, one month before the Secondary Offering, Universal American held its quarterly conference for district managers. CW-3 was told by a district manager, who attended the meeting, that Universal senior management disclosed the scope of a further rate increase that was to be implemented in August 2005; and

d.      According to CW-4, a former regional manager, in April 2005, CW-4 attended a meeting in which "[t]hey say, well what we're going to do is start standardizing commissions. They raised us a couple of commissions that really didn't help us and took our main ones and lowered them down."

50.    These Defendants understood and appreciated that the impending rate increase, which would be far larger than what they had led the market and their agents to believe, would cause Universal American to experience increased Rollover and Lapsation. According to numerous former sales managers from Universal American, the effect of a rate increase of the magnitude sought, obtained and implemented by Universal American would have been known to the Class Action Individual Defendants. For example:

18

a.      According to CW- 1, these Defendants would have known the negative impact

that increasing rates would have on the Company's performance as rate increases would make it more difficult for the Company's agents to sell Universal American's policies, especially when comparable policies were available from other insurance companies for lower premiums. This would, in turn, lead to increased Lapsation and Rollover, since agents, who were paid by commission and who did not want to lose their clients to competitors, would seek to purchase less expensive policies for their clients, even if it meant leaving Universal American. CW-1 explained: "a lot of my income is derived from renewals, which means that the policies I've sold over the past six years, I get a percentage of that every month. Obviously, if they have a huge rate increase and people start leaving to go to another company, that affects my income;"

b.      According to CW-5, a former regional Vice President of a subsidiary of Universal American, Defendants knew that the Company's overall Medicare business was suffering as agents were selling fewer Medicare Supplement policies and policyholders were renewing fewer policies then in effect. CW-5 attributed this decline to the competitive nature of the Medicare Supplement policy business and stated that "the market is competitive and people are inclined to move when the price increases." CW-5 stated that the Company's salespeople warned Universal American's executives, including Defendant Bryant, that rate increases would lead to "business rolling," which, in turn, causes Lapsation. According to CW-5, "Lapsation is a killer" since renewals are the main source of profit for an insurance company;

c.      According to "CW-6", a former Senior Solutions Sales Center Manager at a Universal American subsidiary, Universal American executives, including Defendant Wehner, knew that the significant rate increase to be effective August 1, 2005 would create a huge gap

19

between Universal American's premiums and those of the Company's competitors and, in effect, cause sizeable Lapsation, Rollover and loss of overall business;

d.      According to CW-5 and CW-3, the additional rate increase in August 2005 was unusual for two reasons. First, health insurance rates were generally modified once a year. Second, the Company's August 2005 rate increase – *12.5%* – was considered excessive in comparison with the industry norm, which, according to CW-3, averaged between 6% and 8%. Moreover, Defendant Barasch, in a conference call with investors on February 17, 2005, stated that any further increase would be at most between 8 and 10%. Then, only months later (August 2005), the Company increased its rates by an astounding 12.5%; and

e.      CW-3 and CW-5 also confirmed that the mid-year increase in rates predictably resulted in customers looking elsewhere for better priced health insurance premiums and placed the Company's sales staff at a competitive disadvantage. A mid-year increase in rates also negatively impacts the commissions of salespeople and, predictably, led the Company's agents to seek policies for their new clients at other insurance companies and to direct existing customers to those other companies once their existing policies lapsed or were up for renewal. In some cases, the agents also "rolled" their existing customers, or books of business to other insurance companies.

51.    Universal American's sales efforts were also being hampered by intense price competition and declining customer service. According to CW- 1, the Medicare plans being offered by the Company were very expensive. Universal American's  newer plans, according to CW-1, which were late in being offered, involved a significant decrease in commissions. CW-1 stated: "our plans were getting way too expensive, where we couldn't sell them. We were almost the most expensive ones in the state. We were having problems keeping our clients because of

that. We were selling mostly Plan D and Plan G, and [Universal] came out with Plan E with lower rates so we could sell it, but they lowered the commissions on that product. Our agents were forced to sell Plan E but they took almost a 30% cut in their pay." Plan E, according to CW-1, was a cheaper plan for clients, but by the time that Universal American began to offer it, Universal American's competition already had comparable plans in place. Moreover, according to CW- 1, the commissions offered to agents on Plan E were much lower than other commissions so agents began to leave *en masse:* "we were getting 18% commission and E Plan paid 12%. Because of that, a lot of agents started leaving the company and going to other companies where they could get the pay back, and when those agents left they would take business with them."

52.    In addition, according to CW-1, the Company's customer service in its Pyramid subsidiary, which dealt with, among other things, Medicare Supplement policyholders, significantly deteriorated when the Company moved Pyramid's operations from Kansas City to Pensacola and lowered salaries. According to CW-1: "Of course, you get what you pay for, so the service went way down. We used to be able to justify the prices that Pyramid charged because of excellent service but when [Universal] bought them, they just ruined the service."

53.    These customer service problems were confirmed by CW-5, who stated that, "before being acquired by Universal, Pyramid provided 'flawless service' to its policyholders and as a result there were 'no problems."' After the move from Kansas City to Florida, however, Pyramid's service level "went bad" since there were "two very different philosophies" between Pyramid (as a stand-alone company) and Universal concerning the services to be provided to policyholders in administering the insurance policies. According to CW-3 and CW-5, these customer service problems led customers to purchase policies from companies other than Pyramid and Universal. Despite knowing of these customer service problems, or recklessly

21

disregarding them, Defendants represented to investors during the Class Period that Universal offered "quality" customer service.

**Defendants Cash In Before The Full Extent Of The Rate Increase Is
Made Public  And The Inevitable Negative Effects Are Experienced**

54.    Numerous former employees of Universal have recounted that Defendants were concerned about maintaining the value of the Company's stock price during the Class Period. According to CW-6, in May 2005, Defendant Wehner acknowledged that the Company's Medicare business was suffering, but that it had not yet affected the Company's stock and that the Company's executives planned to make things look good for as long as possible. According to CW-6, "[w]e asked, how can it be so bad when the stock is doing so well and [Wehner] said well, it hasn't gotten out to the stock yet and it's our job to keep the stock looking as good as it can as long as possible." CW-6 stated that "[t]his was a direct quote from Bill Wehner who was a president of the company."

55.    CW-6 also stated that in response to questions about what was most important for the Company, Defendant Wehner agreed with one of the responses that "it's the stock price. And Bill agreed, yes it's the stock price and that's all we do and that's all we care about is the stock price." In response to questions about why insiders were selling shares, CW-6 stated that Wehner retorted that "why we're selling it is none of your business and yes, business is bad, so yes, of course, [shares are] going to go South."

56.    CW-1 stated that after the January 2005 Meeting, he came to the conclusion that Universal was in "deep trouble." CW-1 also said that "it's real obvious to me – they artificially inflated the stock price over the short term, knowing that in the long term their actions were going to cause the stock price to go down eventually. They ran us off – we sold a lot of business for them."

CW- 1 also stated that he was told at the meeting "that everything that Barasch did was for the stock price."

57.    Prior to disclosing any of this information to investors, the Class Action Individual Defendants were able to sell 490,000 of their personally-held shares to investors at prices as high as $24.80 per share, which was significantly above the $14.17 per share price that the shares traded at once the artificial inflation was removed from the stock price after the disclosure on October 28, 2005. Moreover, the Company and its majority shareholder, Capital Z and its affiliates, were able to raise in excess of $157 million (less expenses) in the Secondary Offering of 7,000,000 shares of Universal stock (plus an overallotment) at $23.61 per share on June 17, 2005:

**Materially False and Misleading Statements Made During the Class Period**

58.    The Class Period begins on February 16, 2005. On that date, Universal American issued a press release announcing its "record" financial results for its fourth quarter ended December 31, 2004 and year end of 2004. For the quarter, the Company reported net income of $17.4 million, earnings of $0.30 per diluted share and total revenues of $206.6 million. Defendant Barasch commented on the Company's performance, stating, in pertinent part, as follows:

> The fourth quarter of 2004 was another strong quarter for our company, capping a terrific year. A significant driver of our increased profitability in 2004 was the addition of Heritage Health Systems in May; however, we also experienced core growth of 21% in revenues and 20% in profits from our existing businesses as compared to last year.

> We are especially pleased with our improved strategic position in the senior health insurance market. For more than 10 years, Universal American built an enviable franchise in the sale of Medicare supplement products. With the addition of Heritage, we are now building a Medicare Advantage business as well. As this market for individual senior health insurance grows, our company is well-positioned to offer the full range of needed products.

<p align="center">*    *    *</p>

<p align="center">23</p>

The Senior Solutions program is a key part of our efforts to increase senior market sales. We continue to emphasize recruiting and new office expansion, and we have begun to see the results in new sales.

\*       \*       \*

For the full year, the loss ratio on our Medicare supplement business increased by 80 basis points to 69.1% from 68.3% in 2003 and segment income was 1% lower than last year. *We have already begun to apply for and implement rate increases that should allow us to reverse this trend.* [Emphasis added.]

59.     The statement referenced above in ¶

58 that "we are especially pleased with our improved strategic position in the senior health insurance market" was materially false and misleading because, at that time, the Company's strategic position in the senior market was not "improved" as the Company was experiencing increased loss claims. In addition, the statement in ¶58 that the Company was "well-positioned to offer the full range of needed products" was materially false and misleading because the Company was not well-positioned as its products were over-priced and its customer service was deteriorating. Finally, the statement in ¶58 that "we have already begun to apply for and implement rate increases that should allow us to reverse this trend" was materially false and misleading because it mentioned the topic of the rate increase but failed to disclose that the rate increase being requested was approximately 40% more than the rate increase typically sought by the Company or implemented in the industry.

60.     The next day, on February 17, 2005, the Company held a conference call with investors and analysts to discuss its financial results. On the call, Defendant Barasch stated:

I'm happy to report another solid quarter for Universal American capping off a terrific year of financial success and strategic advance for our Company. Over the past several years we've built our Company through a combination of consistent internal growth and opportunistic acquisitions. Both of these core corporate attributes clearly were in evidence in the fourth quarter and in the past year.

24

\*      \*    \*

The acquisition of Heritage also significantly improved our strategic position in the senior market. As this market grows and as more individuals within this demographic segment need to acquire some sort of health insurance coverage, our Company is an in ideal position to offer the products that are needed whether on the indemnity side or the managed care side.

\*      \*    \*

We're very optimistic about our ability to keep growing the senior health insurance business through our career agents. As we announced last year we rolled out the Senior Solutions program to our career agents and the reaction continues to be very enthusiastic. Since the beginning of the year we opened up 22 new Senior Solutions centers and now have a total of 84 offices under this banner. As these new offices take root, we expect that this branding of our product line will lead to better recruiting and higher sales in the near term.

\*        \*      \*

Despite a 15 percent increase in revenues resulting from a combination of new sales, rate increase and increased retention, our senior market brokered segment was somewhat disappointing this quarter as a result of higher than expected Med-Sup loss ratios. For the full year loss ratio in our Med-Sup asset business increased by 80 basis points to 69.1 percent up from 68.3 percent last year and consequently segment income was 1 percent lower than last year. We've already begun to apply for and implement rate increases that should allow us to reverse this trend through the course of 2005.

We're confident that this positive trend in new sales activity in the Medicare Advantage segment will continue.

\*      \*      \*

But even with increased competition we think we are well-positioned to continue our pattern of growth.

\*      \*      \*

With our existing strength in Medigap, our growing presence in the Medicare Advantage market and the possibility of participating in a prescription drug insurance market that will emerge next year, we think we are in an excellent strategic position to benefit from the enormous opportunities that exist in the senior health insurance market.

Defendant Barasch also commented on the Company's earnings expectations for the full year 2005 and on the increase in the Company's MLR:

> With the acquisition – with the addition of Heritage for a full year *we anticipate earnings for 2005 in the range of $1.17 to $1.24 per diluted share excluding realized gains. . . . Keep in mind that Medicare supplemental loss ratios are higher in the first quarter as policyholders satisfy their Medicare deductibles and then the loss ratios trend lower through the balance of the year.* [Emphasis added.]

61.    The statements referenced above in ¶60 that "our Company is an ideal position to offer the products that are needed," "we expect that this branding of our product line will lead to better recruiting and higher sales in the near term" and "we think we are in an excellent strategic position to benefit from the enormous opportunities that exist in the senior health insurance market" were materially false and misleading because, at that time, the Company was not in an ideal or strategic position as its products were over-priced and its customer service was deteriorating. In addition, the statements in ¶60 that "we're optimistic about our ability to keep growing the senior health insurance business through our career agents" and referencing the Company's "existing strength in Medigap" were materially false and misleading because, at that time, the Company's growth was slowing and it was experiencing substantial Lapsation and Rollover. Also, the statement in ¶60 that "[w]e've already begun to apply for and implement rate increases that should allow us to reverse this trend" was materially false and misleading because it mentioned the topic of the rate increase but failed to disclose that the rate increase being requested was approximately 40% more than the rate increase typically sought and approved. Further, the statement in ¶60 that "even with increased competition we think we are well positioned to continue our pattern of growth" was materially false and misleading because the Company was being hurt by its competition, who offered equivalent policies for lower premiums, resulting in increased Lapsation and Rollover at Universal. Moreover, the statement in ¶60 that "we anticipate earnings for 2005 in the range of $1.17 to $1.24 per diluted share" was materially false and

26

misleading and lacking in a reasonable basis because the Company was experiencing increased loss claims and its higher rates and lower commissions were causing increased Lapsation and Rollover. Lastly, the statement in ¶60 that "Medicare supplemental loss ratios are higher in the first quarter as policyholders satisfy their Medicare deductibles and then the loss ratios trend lower through the balance of the year" was materially false and misleading because the higher loss ratios were due to an increasing rate of claims.

62.     The February 17, 2005 conference call also included a question and answer session between analysts and Defendants Barasch and Waegelein. In response to questions about the Company's potential rate increases, the exchange between Jason Zucker, an analyst at Fox-Pitt, and Defendant Barasch went as follows:

> **<Q -** Jason Zucker**>:** Good morning everybody. . . . Can you talk about price increases that you've been getting on average and maybe can you actually go back to '03 and tell us what they were in '03 and '04 and what they are expected to be in '05?
>
> **<A -** Richard Barasch**>:** In '03 they were around 10 percent and '04 they were give or take 8 or 9 percent and we think they're going to be 8 or 9 -- between 8 and 10 percent going forward.
>
> **<Q -** Jason Zucker**>:** I guess -- should they be higher going forward given that the last couple of rounds of price increases weren't enough to keep the loss ratios where you needed them to be?
>
> <A - Richard Barasch>: . . . it was 80 basis points on a year-over-year basis and we want to be sure we do the appropriate ones and not overshoot it as well.

When questioned about the increase in higher claims filed in the fourth quarter of 2004, Defendant Barasch responded that the Company was 80 basis points higher than the prior year and that, "while we are not delighted with this by any stretch, *we think this is a very, very solvable issue for us."* [Emphasis added.]

63.     The statement referenced above in ¶62 that the rate increase would be "between 8 and 10 percent going forward" was materially false and misleading because the rate increase that was –or was going to be – requested was approximately 40% more than the rate increase typically sought and approved and 25% to 40% higher than the rate increase indicated by Defendant Barasch. In addition, the statement in ¶62 that "we think this is a very, very solvable issue for us" was materially false and misleading because the Company was continuing to experience increased loss claims, its products were over-priced, its customer service was deteriorating and it was suffering from increased Lapsation and Rollover.

64.     Universal American's  financial results for the fourth quarter and year ended December 31, 2004 were repeated in the Company's Form 10-K, which was filed with the SEC on or about March 16, 2005 ("2004 10-K"). Universal American's  2004 10-K was signed by executives of the Company, including Defendants Barasch and Waegelein. With regard to the Company's loss ratios, the 2004 10-K stated, in pertinent part, as follows:

> Most jurisdictions mandate minimum benefit standards and loss ratios for accident and health insurance policies. Generally we are required to maintain, with respect to our individual long term care policies, minimum anticipated loss ratios over the entire period of coverage. With respect to our Medicare Supplement policies, we are generally required to attain and maintain an actual loss ratio, after three years, of not less than 65 percent of earned premium. We provide, to the insurance departments of all states in which we conduct business, annual calculations that demonstrate compliance with required loss ratio standards for both long term care and Medicare Supplement insurance. We prepare these calculations utilizing statutory lapse and interest rate assumptions. In the event we fail to maintain minimum mandated loss ratios, our insurance company subsidiaries could be required to provide retrospective premium refunds or prospective premium rate reductions. We believe that our insurance company subsidiaries currently comply with all applicable mandated minimum loss ratios. In addition, we actively review the loss ratio experience of our products and request approval for rate increases from the respective insurance departments when we determine they are needed. We cannot guarantee that we will receive the rate increases we request.

With regard to the Company's competitive compensation and level of customer service, the 2004 10-K provided:

We believe we can meet these competitive pressures by offering a high level of service and accessibility to our field force and by developing specialized products and marketing approaches. We also believe that our policies and premium rates, as well as the commissions paid to our sales agents, are generally competitive with those offered by other companies selling similar types of products in the same jurisdictions. In addition, our insurance subsidiaries operate at lower policy

allowing us to offer competitive rates while maintaining underwriting margins. In the case of our Medicare Supplement business, low expense levels are necessary in order to meet state mandated loss ratios and achieve the desired underwriting margins. Also, we believe our disciplined underwriting procedures, pricing practices, effective rate management and related staff, our quality customer service, our significant market position in certain geographic areas, the quality of our distribution network and our appropriate financial strength, provide additional strength to compete effectively.

The Company's 2004 10-K also contained the following statements regarding the purported

effectiveness and sufficiency of the Company's controls and procedures:

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our "disclosure controls and procedures" (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) as of December 31, 2004. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, as of December 31, 2004, our disclosure controls and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information that we are required to disclose in the reports that we file or submit under the Exchange Act.

**Management's Annual Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting to provide reasonable assurance regarding the reliability of our financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Management assessed our internal control over financial reporting as of December 31, 2004, the end of our fiscal year. Management based its assessment on criteria established in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Our management believes that the COSO framework is a suitable framework for its evaluation of our internal control over financial reporting because it is free from bias, permits reasonably consistent qualitative and quantitative measurements of our internal controls, is sufficiently complete so that those relevant factors that would alter a conclusion about the effectiveness of our internal controls are not omitted and is relevant to an evaluation of internal control over financial reporting. Management's assessment included evaluation of such elements as the design and operating effectiveness of key financial reporting controls, process documentation, accounting policies, and our overall control environment.

*Based on our assessment, management has concluded that our internal control over financial reporting was effective as of the end of the fiscal year to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with generally accepted accounting principles. Management has not identified any material weaknesses in our internal control over financial reporting.* We reviewed the results of management's assessment with the Audit Committee of our Board of Directors. [Emphasis added.]

65.    The statement referenced above in ¶64 that "[w]e also believe that our policies and premium rates, as well as the commissions paid to our sales agents, are generally competitive" was materially false and misleading because the Company's products were overpriced and the commissions paid to the Company's sales agents were below market rates. In addition, the statement in ¶64 that "we believe our . . . pricing practices . . . [and] our quality customer service . . . provide additional strength to compete effectively" was materially false and misleading because the Company's products were overpriced and its customer service was deteriorating. Lastly, the statements in ¶64 concerning the effectiveness of the Company's disclosure controls in the Form 10-K were materially false and misleading because the Company's disclosure controls, as plead herein, were grossly inadequate and ineffective.

66.    The Company's 2004 10-K also included certifications by Defendants Barasch and Waegelein, which attested to the purported accuracy and completeness of Universal's financial and operational reports. The certifications read as follows:

1.    I have reviewed this annual report on Form 10-K of Universal American Financial Corp.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all

material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting: and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*          *          *

31

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350**
**AS ADOPTED PURSUANT TO SECTION 906**
**OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10-K of Universal American Financial Corp. (the "Registrant") for the year ended December 31, 2004, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), Richard A. Barasch, Chief Executive Officer of the Registrant, and Robert A. Waegelein, Chief Financial Officer of the Registrant, each hereby certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to the best of his knowledge:

(1)     The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: March  16,  2005
*/s/* Richard  A.  Barasch
Chief Executive Officer

Date: March 16, 2005
*/s/* Robert A. Waegelein
Chief Financial Officer

67.     The statement referenced above in ¶66 that the Form 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading" were materially false and misleading for the reasons set forth in ¶65. In addition, the statements in ¶66 concerning the adequacy of the Company's disclosure controls in the certifications signed by Defendants Barasch and Waegelein were materially false and misleading because the Company's disclosure controls, as plead herein, were grossly inadequate and ineffective.

68.     On May 3, 2005, Universal American issued a press release announcing "record" financial results for its first quarter, the period ended March 31, 2005.  For the quarter, the Company reported net income of $ 16.1 million, earnings per diluted share of $0.28 and total

32

revenues of $224.2 million. Defendant Barasch commented on the Company's financial performance, stating, in pertinent part, as follows:

> We continued our strong performance in the first quarter of 2005. Led by outstanding results in our Medicare Advantage segment, Universal American has maintained a superior rate of growth. In addition, we are very enthusiastic about our strategic position in the senior health insurance market. To complement our Medicare supplement franchise, we are now building a Medicare Advantage business as well. As the market for individual senior health insurance grows, our company is well-positioned to offer the full range of needed products.
>
> *       *       *
>
> Senior Market Health
>
> Although revenues rose by 12% to $99.2 million, as compared to the first quarter of 2004, results in our Senior Market Health segment were negatively impacted by higher morbidity, primarily from the increase in the deductible for Part B coverage. Our Medicare supplement loss ratio increased 140 basis points to 72.8% from 71.4% in the first quarter last year, leading to a 14% decrease in segment income for the quarter. We have already applied for and will implement rate increases that should allow us to reverse this trend. As we have discussed previously, first quarter results in the Medicare supplement business are impacted by loss ratios that are seasonal and predictably higher than in the succeeding quarters, and we expect to see improvement throughout the balance of the year.
>
> Our senior market sales force continues to perform well.

69.    The statements referenced above in ¶68 that "we are very enthusiastic about our strategic position in the senior health insurance market" and "our company is well-positioned to offer the full range of needed products" were materially false and misleading because the Company was not strategically or well-positioned as: (i) its products were over-priced; (ii) its customer service was deteriorating; and (iii) its agents were unhappy by the reduction in their commissions. In addition, the statement in ¶68 that "[w]e have already applied for and will implement rate increases that should allow us to reverse this trend" was materially false and misleading because it mentioned the topic of the rate increase but failed to disclose that the rate increase being requested was unusual in size and timing and would lead to Lapsation and Rollover. Further, the statement in ¶68 that "first quarter results in the Medicare supplement business are impacted by loss ratios that are seasonal and predictably higher than in the succeeding quarters, and we expect to see improvement throughout the balance of the year" was false and misleading

33

because the higher loss ratios were due to, for example, an increasing rate of claims and strong competition from other insurers. Lastly, the statement in ¶68 that "[o]ur senior market sales force continues to perform well" was materially false and misleading because, generally, the Company was experiencing higher loss ratios and increased Lapsation and Rollover.

70.     The next day, on May 4, 2005, the Company hosted a conference call with investors and analysts to discuss Universal American's  financial results. Defendant Barasch began the discussion with an overview of the Company's performance stating, in pertinent part, as follows:

> With our existing strength in the Medicare supplement business, our growing presence in the Medicare Advantage market, and our participation in the prescription drug insurance market we think that we're in an ideal strategic position to benefit from the enormous opportunities that exist in the senior health insurance market.
>
> *       *       *
>
> As compared to the first quarter of last year, our Med Sup loss ratio increased by 140 basis points to 72.8%, resulting in a 14% decrease in segment income. Part of this increased was anticipated as a result of a $10 increase in the Part D deductibles that we cover, and we've already begun to implement rate increases, which should allow us to reverse this trend. Further, as we had pointed out in prior years, first quarter results in the Medicare Supplement business are negatively impacted by loss ratios, and are seasonal and predictably higher than in the succeeding quarters of the year, and we expect to see improvements through the balance of the year.
>
> *       *       *
>
> We are optimistic about our ability to keep growing the senior health insurance business, particularly with the introduction of the Part D program next year. We continue to see progress in our Senior Solutions marketing efforts. . . .

With respect to earnings for the full year 2005, Defendant Barasch stated:

> With the exception of the increased expenses that we will incur to prepare for the implementation of Part D, *we reiterate our earnings guidance for 2005 in the range of $1. 17 to $1.24 per diluted shares* excluding realized gains. For the second quarter, we anticipate earnings of $0.28 to $0.30 with *much of the anticipated improvement over the first quarter coming because Medicare supplement loss ratios are higher in the first quarter as policyholders satisfy their deductibles and these loss ratios trend lower through the balance of the year.* [Emphasis added.]

71.    The statement referenced above in ¶70 referencing the Company's "existing strength in the Medicare supplement business" was materially false and misleading because, at that time, the Company's growth was slowing and it was experiencing substantial Lapsation and Rollover. In addition, the statements in ¶70 that "we're in an ideal strategic position to benefit from the enormous opportunities that exist in the senior health insurance market," "[w]e are optimistic about our ability to keep growing the senior health insurance business," and "[w]e continue to see progress in our Senior Solutions marketing efforts" were materially false and misleading because the Company's products were over-priced, its customer service was deteriorating, and its agents expressed dissatisfaction and warned of Rollover. Further, the statement in ¶70 that "we've already begun to implement rate increases, which should allow us to reverse this trend" was materially false and misleading because it mentioned the topic of the rate increase but failed to disclose that the rate increase being requested was excessive and unusual in timing. Additionally, the statements in ¶70 that "first quarter results in the Medicare Supplement business are negatively impacted by loss ratios, and are seasonal and predictably higher than in the succeeding quarters of the year, and we expect to see improvements through the balance of the year" and "Medicare supplement loss ratios are higher in the first quarter as policyholders satisfy their deductibles and these loss ratios trend lower through the balance of the year" were materially false and misleading because the higher loss ratios were due to an increasing rate of claims and strong competition, and Defendants knew that the trend would not improve. Lastly, the statement in ¶70 that "we reiterate our earnings guidance for 2005 in the range of $1.17 to $1.24 per diluted shares" was materially false and misleading and lacking in a reasonable basis because the Company was experiencing increased loss claims, and its higher rates and lower commissions were causing increased Lapsation and Rollover.

35

72.     Universal American's financial results for the first quarter ended March 31, 2005 were repeated in the Company's Form 10-Q, which was filed with the SEC on or about May 10, 2005 ("1Q'05 10-Q"). Universal American's 1Q'05 10-Q was signed by executives of the Company, including Defendants Barasch and Waegelein. The Company's 1Q'05 10-Q contained the following statements regarding the purported effectiveness and sufficiency of the Company's controls and procedures:

> Our management evaluated, with the participation of our principal executive and principal financial officers, the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")), as of the end of the period covered by this report. Based on their evaluation, our principal executive and principal financial officers concluded that our disclosure controls and procedures are effective to ensure that information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the Securities and Exchange Commission.

### Change in Internal Control Over Financial Reporting

> There has been no material change in our internal control over financial reporting (as defined in Rules 1 3a - 15(f) and 1 5d - 15(f) under the Exchange Act) that occurred during the quarter ended March 31, 2005 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

73.     The statements referenced above in ¶72 concerning the effectiveness of the Company's disclosures were materially false and misleading because the Company's disclosure controls, as plead herein, were grossly inadequate and ineffective.

74.     The 1Q'05 10-Q also contained certifications by Defendants Barasch and Waegelein in which they attested to the purported accuracy and completeness of Universal American's financial and operational reports. The certifications read as follows:

> 1.     I have reviewed this annual report on Form 10-Q of Universal American Financial Corp.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting: and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions)

a.      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are

reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

        b.    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*     *     *

## CERTIFICATION PURSUANT TO
## 18 U.S.C. SECTION 1350
## AS ADOPTED PURSUANT TO SECTION 906
## OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report on Form 10-Q of Universal American Financial Corp. (the "Registrant") for the quarter ended March 31, 2005, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), Richard A. Barasch, Chief Executive Officer of the Registrant, and Robert A. Waegelein, Chief Financial Officer of the Registrant, each hereby certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to the best of his knowledge:

(1)    The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

(3)
Date: May 10, 2005 /s/
 Richard A. Barasch
Chief Executive Officer

Date: May 10, 2005 /s/
Robert A. Waegelein
Chief Financial Officer

75.    The statement referenced above in ¶74 that the Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading" were materially false and misleading for the reasons set forth in ¶73. In addition, the statements in ¶74 concerning the adequacy of the Company's disclosure controls in

the certifications signed by Defendants Barasch and Waegelein were materially false and misleading because the Company's disclosure controls, as plead herein, were grossly inadequate and ineffective.

76.    On June 6, 2005, the Company issued a press release announcing hat it had launched its Secondary Offering of 7,000,000 shares of its common stock, 2,000,000 of which were being offered by Universal American and 5,000,000 of which were being offered by the Company's largest shareholder, Capital Z Financial Services Fund II, L.P. and its affiliates.

77.    On June 17, 2005, the Company issued a press release announcing the pricing of the Secondary Offering at a price of $23.61 per share. Universal American also announced that it granted the underwriters in the offering an option to purchase up to an additional 1,050,000 shares of common stock to cover over-allotments, if any. Following this Offering, Capital Z retained approximately 20.2 million shares, or approximately 34.9% of Universal American's outstanding common stock. These shares were being offered under Universal American's effective shelf registration statement filed with the SEC on or about December 10, 2004 via a Form S-3/A (the "Registration Statement") that was signed by the Company's executives, including Defendants Barasch and Waegelein.

78.    Also in connection with the Secondary Offering, on or about June 17, 2005, Defendants filed a Form 424B2 prospectus with the SEC (the "Prospectus") that incorporated the Registration Statement. The Prospectus included statements regarding the Company's competitive compensation and "quality" customer service:

> *We also believe that our policies and premium rates, as well as the commissions paid to our sales agents, are generally competitive with those offered by other companies selling similar types of products in the same jurisdictions. In addition, our insurance subsidiaries operate at lower policy acquisition and administrative expense levels than some other insurance companies, allowing us to offer competitive rates while maintaining underwriting margins.* In the case of our

> Medicare Supplement business, low expense levels are necessary in order to meet state mandated loss ratios and achieve the desired underwriting margins. Also, we believe our disciplined underwriting procedures, pricing practices, effective rate management and related staff, our quality customer service, our significant market position in certain geographic areas, the quality of our distribution network and our appropriate financial strength, provide additional strength to compete effectively. [Emphasis added.]

The Prospectus also contained statements concerning future growth in the senior market. Specifically, the Prospectus represented that conditions in the senior market "present significant opportunities for us to increase the sale of our core products" (emphasis added.). The Prospectus also described the strength of the Company's Medical Supplement business, stating:

> We believe that the market for Medicare Supplement products will continue to be vibrant, especially because many seniors may lose similar coverage that had previously been offered to them as a retiree benefit by their former employer.

79.    The statement referenced above in ¶78 that "[w]e also believe that our policies and premium rates, as well as the commissions paid to our sales agents, are generally competitive with those offered by other companies" was materially false and misleading because the Company's products were overpriced and the commissions paid to the Company's sales agents were below market rates. In addition, the statement in ¶78 that "our insurance subsidiaries operate at lower policy acquisition and administrative expense levels than some other insurance companies, allowing us to offer competitive rates" was materially false and misleading because the Company's products were overpriced. Further, the statement in ¶78 describing the Company's "quality customer service" was materially false and misleading because its customer service was deteriorating. Lastly, the statement in ¶78 that current conditions in the senior market "present significant opportunities for us to increase the sale of our core products" was materially false and misleading because the Company's products were overpriced, its customer service was deteriorating and its agents were unhappy with the Company's reduced commissions.

40

80.    On August 2, 2005, Universal American issued a press release announcing "record" financial results for its second quarter, the period ended June 30, 2005. For the quarter, the Company reported net income of $ 18.7 million, earnings per diluted share of $0.32 and total revenues of $229.6 million. Defendant Barasch commented on the Company's financial performance, stating, in pertinent part, as follows:

> We are very pleased with the results in the second quarter of 2005 and continue to be enthusiastic about our strategic position in the senior health insurance market. In addition to our established position in the Medicare Supplement business, we are rapidly expanding our Medicare Advantage business. As the market for individual senior health insurance grows, our company is well-positioned to offer the full range of needed products.

<div align="center">*        *        *</div>

> Senior Market Health

> Although our Medicare Supplement premium grew by 10% over the second quarter of last year as a result of new sales, reduced reinsurance ceded and rate increases, profits rose only by 5%. In line with recent trends, our Medicare supplement loss ratio increased 200 basis points to 71.8% from 69.8% in the second quarter last year, in part as a result of the increase in the Part B deductibles. We continue to implement rate increases that, along with expected seasonal reductions in loss ratios, should result in more favorable results through the balance of the year. In addition, profitability was impacted by the incurral of $0.4 million in direct expenses relating to the implementation of Part D.

> Our senior market sales force continues to perform well. Even with lower Medicare Supplement sales, overall sales by our independent and career agents, including the sale of Medicare Advantage products, increased by 33% as compared to the second quarter of 2004.

81.    The statements referenced above in ¶80 that we "continue to be enthusiastic about our strategic position in the senior health insurance market" and "our company is well-positioned to offer the full range of needed products" were materially false and misleading because, at that time, the Company's position was not "strategic" and the Company was not "well-positioned" as it was experiencing increased loss claims, and substantially high incidences of Lapsation and Rollover. In addition, the statement in ¶80 that "[w]e continue to implement rate increases that,

<div align="center">41</div>

along with expected seasonal reductions in loss ratios, should result in more favorable results through the balance of the year" was materially false and misleading because it mentioned the topic of the rate increase but failed to disclose that the rate increase being requested was excessive in size and unusual in timing and because the higher loss ratios were due to an increasing rate of claims. Lastly, the statement in ¶80 that "[o]ur senior market sales force continues to perform well" was materially false and misleading because the Company was experiencing higher loss ratios and increased Lapsation and Rollover.

82.     The next day, on August 3, 2005, the Company hosted a conference call with investors and analysts to discuss Universal American's  financial results. Defendant Barasch began the discussion with an overview of the Company's performance stating, in pertinent part, as follows:

> I'm happy to report another solid quarter of growth, profitability and strategic advance for Universal American. . . . [W]e think that we're in an ideal strategic position to benefit from the enormous opportunities that exist in the senior health insurance market.
>
> \*          \*          \*
>
> It's important to note that Medicare supplement loss ratios are seasonably higher in the beginning of the year and improve throughout the balance of the year, as the deductibles that we cover are satisfied.
>
> \*          \*          \*
>
> We're optimistic about our ability to keep growing the senior health insurance business, particularly with the introduction of the Part D program next year.
>
> \*          \*          \*
>
> Now, thinking about the balance of the year, factoring in the dilution caused by the issuance of new shares in the recent offering and the expenses that we'll incur for the balance of the year getting ready for Part D, our earnings guidance for 2005 should be in the range of $1.13 to $1.17 per share, excluding any realized gains. *For the third quarter, we anticipate earnings of 29 to $0.31 per share, with much of the anticipated improvement coming as a result of seasonal improvements in Medicare supplement loss ratios.* [Emphasis added.]

42

83.     The statements referenced above in ¶82 that "we're in an ideal strategic position to benefit from the enormous opportunities that exist in the senior health insurance market" and "[w]e're optimistic about our ability to keep growing the senior health insurance business" were materially false and misleading because, at that time, the Company was experiencing increased loss claims and high incidences of Lapsation and Rollover. In addition, the statements in ¶82 that "Medicare supplement loss ratios are seasonably higher in the beginning of the year and improve throughout the balance of the year, as the deductibles that we cover are satisfied" and that "much of the anticipated improvement [will be] coming as a result of seasonal improvements in Medicare supplement loss ratios" were materially false and misleading because the higher loss ratios were due to an increasing rate of claims and strong competition from other insurers and Defendants knew the trend would not reverse. Lastly, the statement in ¶82 that "our earnings guidance for 2005 should be in the range of $1.13 to $1.17 per share" was materially false and misleading and lacking in a reasonable basis because the Company was experiencing increased loss claims and its higher rates and lower commissions were causing increased Lapsation and Rollover.

84.     The August 3, 2005 conference call also included a question and answer session between several analysts and Defendants Barasch and Waegelein, in relevant part, as follows:

> <Q - Scott Fidel (analyst J.P. Morgan)>: Okay. And then second question it just has to do with the Medicare margins for this year. Obviously, the business is in growth mode right now. But just two things. One, just what do you think is a reasonable run rate on medical loss ratio given that you received the risk adjusters last quarter for this year, and then maybe longer term . . . ?

> <A - Richard Barasch>: I think, you know, it is very hard to pin the medical loss ratio to a number because we do – we're in the health insurance business and the numbers move. We're starting to see a pattern developing, somewhere between 71.5 and 72.5, sort of on a consistent basis. I think that is a reasonable band to think about, although, it's likely that over time it will go to the higher part of that band.

\*       \*       \*

<Q – Steven Schwartz (analyst, Raymond James)>: I wanted to follow up quickly, as I learn more and more about this business, the seasonality of the revenues in the Medicare Advantage. Is that associated with the risk adjuster that took place in the first quarter?

<A – Richard Barasch>: It is associated with several factors. That's one.

And second is that we're growing pretty rapidly and one of the hallmarks of our organization is the ability pretty quickly to determine where people fit in the risk adjuster categories. So, you know, there is a great deal of sensitivity, if the new business we're bringing on is healthier, our price per month will go down a little bit. Or it's sicker, it's going to go up a little bit. So we're going to see some cyclicality. You know, [inaudible] seasonality is the wrong way of looking at it. It is not going to be a straight line. We're going to see some movement in those numbers as our book of business changes.

I think the key here, very importantly, is that we're seeing – we see these numbers move around a little bit, largely because I think we're so in tune with what the health status of our patients are, given the close relationship we've got with physicians.

<Q – Steven Schwartz>: . . . if you are bringing up or bringing in healthier people, compared to what you had in a sense, if that's just the way the mix is going, shouldn't that mean less expenses?

<A – Richard Barasch>: It should, it should, but it's not going to – but, you know, again, we're not going to see a one-to-one lag on this from – in each period, and I think you're going to see a little bit of volatility. You know, again, the volatility is going to be in sort of a fairly narrow band, Steve, you know, given, with our loss ratios, and I think you're going to see not a lot of lot of volatility, but a touch of volatility in that numbers.

<Q – Steven Schwartz>: . . . following up on that, should we expect a risk adjuster in the third quarter?

<A – Bob Waegelein>: Steve, we've been booking our estimate of what we believe our risk adjustment payment will be. As Richard indicated, we're pretty close to our physicians and our membership, so we know their health status and I think we can predict fairly well what we think that payment will be. So we've been accruing, at a conservative pace, the amount that we think CFS will be paying in the future for that.

\*                         \*       \*

44

<Q - Josh Raskin (analyst Lehman Brothers)>: [. . .] Lastly, . . . [the] guidance - it seems like if I exclude or if I put back, I guess, the impact from the second area and then some of the Part D costs, it seems like the guidance may have picked up a slight dip for the second half of the year. Were there any specific segments that we should think about changing?

<A - Richard Barasch>: You know, again, I think it is pretty close to where we were. But I think - and we can do the math – you know, the latter has to do with some variability in the Part D number. I think we've left ourselves a little room up and down, given what happens with the bids. But I think directionally we're definitely going to see improvement is in Med Sup, you know, we have got for sure the seasonal improvement coming and a very significant amount of our rate increase activity is coming, starts kicking in in the second half. So we're looking to maybe not get it all back from where we were last year, but get at least part of it back.

<A - Robert A. Waegelein>: Josh, I think, as we indicated recently, we've billed out annual loss ratio. It will be about 100 basis points higher than last year. We're still comfortable with that increase. On an annualized basis these rate increases will bring our spread down to about that number. In addition, though, the Part D expense number that we're adding was diluted a little bit by the effect of the offering. And that might give you a little bit of how that number changes.

<center>*       *    *</center>

<Q – Mark Finkelstein (analyst, Cochran Caronia Securities)>: . . . just going back to the MedSup market. I guess this market has been challenging for a while. Actually based on some comments made by others, it seems to actually have gotten even more challenging. I guess my first question would be, how would you characterize the market and whether that –

<A – Richard Barasch>: . . . I think one thing that absolutely separated us from our – from at least most of our Medicare Supplement competitors is that we've got other product for our agency force to sell and in particular, the private fee-for-service product is a great complement to the Medicare Supplement product. . . . So we've got our agency force very, very motivated, selling a lot of insurance. It just happens that MedSup is not as much as it was. [Emphasis added.]

85.    The statement referenced above in ¶84 that "somewhere between 71.5 and 72.5" was a "reasonable band" for the Company's MLR was materially false and misleading because Class Action Individual Defendants knew the Company's MLR would be higher due to the Company's increasing loss claims and substantial Lapsation and Rollover. In addition, the statement in ¶84 that "you're going to see not a lot of volatility, but a touch of volatility [in the

<center>45</center>

MLR]" was materially false and misleading because the Company's increased loss claims and its higher rates and lower commissions were causing increased Lapsation and Rollover. Additionally, the statements in ¶84 that "where we're definitely going to see improvement is in Med Supp," "[w]e've got, for sure, the seasonal improvement coming and a very significant amount of our rate increase activity starts kicking in in the second half," "we're looking to maybe not get it all back from where we were last year, but get at least part of it back," and "[w]e're still comfortable with [an] increase of [100 basis points higher than last year]" were materially false and misleading because the Company's increased loss claims and its higher rates and lower commissions were causing increased Lapsation and Rollover and a higher overall MLR. Lastly, the statement that "we've got our agency force very, very motivated" was materially false and misleading because the Company's products were overpriced, the commissions paid to the Company's sales agents were below market rates, the Company was experiencing increased Lapsation and Rollover.

86.    Universal American's  financial results for the first quarter ended June 30, 2005 were repeated in the Company's Form 10-Q, which was filed with the SEC on or about August 9, 2005 ("2Q'05 10-Q"). Universal American's  2Q'05 10-Q was signed by executives of the Company, including Defendants Barasch and Waegelein. The Company's 2Q'05 10-Q contained the following statements regarding the purported effectiveness and sufficiency of the Company's controls and procedures:

> Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our "disclosure controls and procedures" (as defined in Exchange Act Rules 13 a- 15(e) and 1 5d- 15(e)) as of December 31, 2004. Based on their evaluation, our principal executive and principal financial officers concluded that our disclosure controls and procedures are effective to ensure that information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the Securities and Exchange Commission.

**Change in Internal Control Over Financial Reporting**

There has been no material change in our internal control over financial reporting (as defined in Rules 1 3a - 15(f) and 1 5d - 15(f) under the Exchange Act) that occurred during the quarter ended June 30, 2005 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

87.     The statements referenced above in ¶86 concerning the effectiveness of the Company's disclosure policies were materially false and misleading because the Company's disclosure controls, as plead herein, were grossly inadequate and ineffective.

88.     The Company's 2Q'05 10-Q also contained certifications by Defendants Barasch and Waegelein, which attested to the purported accuracy and completeness of Universal American's  financial and operational reports. The certifications read as follows:

1.     I have reviewed this quarterly report on Form 10-Q of Universal American Financial Corp.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed

under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

     c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

     d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting: and

   5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

     a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

     b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

<center>*  *  *</center>

<center>**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350**
**AS ADOPTED PURSUANT TO SECTION 906**
**OF THE SARBANES-OXLEY ACT OF 2002**</center>

In connection with the Quarterly Report on Form 10-Q of Universal American Financial Corp. (the "Registrant") for the quarter ended June 30, 2005, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), Richard A. Barasch, Chief Executive Officer of the Registrant, and Robert A. Waegelein, Chief Financial Officer of the Registrant, each hereby certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to the best of his knowledge:

   1.  The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

<center>48</center>

> 2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: August 9, 2005
/s/ Richard A. Barasch
Chief        Executive
Officer

Date: August 9, 2005
/s/ Robert A. Waegelein
Chief Financial Officer

89.   The statement referenced above in ¶88 that the Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading" were materially false and misleading for the reasons set forth in ¶87. In addition, the statements in ¶88 concerning the adequacy of the Company's disclosure controls in the certifications signed by Defendants Barasch and Waegelein were materially false and misleading because the Company's disclosure controls, as plead herein, were grossly inadequate and ineffective.

**The Truth is Revealed**

90.   On October 28, 2005, Universal American issued a press release announcing financial results for its third quarter ended September 30, 2005 that were substantially below its previous guidance and further disclosed that it would also be revising its guidance for full year 2005. For the quarter, the Company reported net income of $15.3 million, or $0.25 per diluted share, and total revenues of $237.0 million. The press release continued, in pertinent part, as follows:

> Universal American's third quarter 2005 earnings were affected by: Higher-than-anticipated loss ratio in the Medicare Supplement business that reduced anticipated earnings by $0.03 per share;

49

- Increased Lapsation in the Medicare Supplement business, which resulted in an accelerated write-down of certain non-cash deferred acquisition costs that reduced anticipated earnings by $0.03 per share; and

- $0.9 million in additional expenses incurred in implementing the Company's Medicare Part D growth initiatives that reduced anticipated earnings by approximately $0.01 per share.

Defendant Barasch commented on the Company's performance, stating, in pertinent part, as follows:

> We are accelerating our strategy of building a diversified business to take advantage of the opportunities that exist in the dynamic and growing senior health insurance market. *We continue to address the loss ratio in our Medicare Supplement business by obtaining appropriate rate increases, and we believe this business will continue to be a valuable, long-term earnings contributor.* Further, the growth of our Medicare Advantage business remains on track in terms of profitability and membership. We also are seeing excellent potential in the Medicare Part D program and believe that our increased investment in its implementation will generate solid returns for our company. [Emphasis added.]

The press release further provided that profits from Medicare Supplement decreased 33% and the Medicare Supplement loss ratio for the third quarter was 71.9%, approximately 290 basis points higher than the Company's third quarter target.

91.     Upon this shocking news, shares of Universal American common stock closed at $14.17 per share, a decline of $8.32 per share, or over 36%, from the previous trading day's close.

92.     Later that day, Defendants hosted a conference call for analysts in which Defendant Barasch stated the following with respect to the MLR:

> The first item I would like to discuss is the loss ratio on our Medicare Supplement business, which came in at 71.9% in the third quarter, consistent with the second quarter but approximately *290 basis points higher than our expectation. This impacted our results by around $0.03 per share.* As a result of higher than anticipated Part B costs (which are essentially the outpatient doctor costs) and skilled nursing facility incidence, we did not see our historical pattern of seasonal reduction in loss ratios in the latter part of the year.

**In light of this development, we have revised our estimate of the loss ratio for the full year 2005 to approximately 72%, around 200 basis points higher than our prior estimate.** Even at these levels, we find our business is quite profitable, but having said that, we are actively obtaining appropriate rate action in an effort to reverse the trend in these numbers. [Emphasis added.]

In response to questions by analysts regarding the cause for the increased MLR, Defendant

Barasch had the following exchange:

<Q - Scott Fidel>…. A couple questions. The first question, just on the higher loss ratio in Med Supp, if you could just elaborate a bit more on specifically what the higher costs that you cited in the press release, what the drivers there are?

<A - Richard Barasch>….There are two, Scott. First is increased Part B, which is doctor, outpatient doctor, incidence. What that means, putting the words aside, is that more doctors are seeing more people in our book of business.

In addition, we're seeing something-- something kind of new emerge, which is skilled nursing facilities and we're seeing an increase in that incidence, as well. That appears to be caused by a little bit of cost shifting in the hospitals from in-patient to out-patient and we're seeing a little bit more of that develop.

<center>*        *        *</center>

<Q - Scott Fidel>…. OK. And just getting back to the question on the lapses. You did mention that the enrollment in the Med Supp business still was in the 310,000 area, which looks to actually be flat sequentially. So what was the specific impact, then, from an enrollment perspective, of the lapses?

<A - Richard Barasch> …. But what-- We track-- we track Lapsation and we can-- we will see in, let's say, the month of August or the month of September, the ending of a policy which-- which we will take off from our DAC numbers. So we had some increases and some decreases. This is more decrease than we usually see.

<center>*        *        *</center>

<Q - Mark Finkelstein> ….A couple of questions here. Can you just elaborate in terms of on the Med Supp side? I guess the rate increase that you're planning on taking, I assume, at the beginning of the year and how you're kind of thinking about a balancing--

<A – Richard Barasch> …. Well, we-- We're not a year cycle, we're on a rolling cycle. We have different blocks of business that come up at different times. We have a fair amount that comes up in the-- at the beginning of the year, but a lot trails through the rest of the year. We, again, are thinking about trend. We're adding incidence, we're adding the effect of the new deductible structure in Part A

<center>51</center>

and Part B and have come up with a number that we think will-- will reverse the trend that we're seeing at this point.

<Q – Mark Finkelstein> **….** OK. I guess what I'm getting at is in terms of kind of implementing the rate increases and then also thinking about the other side of kind of managing the persistency, and also knowing that there is some under-priced product out there in the market, I mean, **how long do you expect it to take? Is this a multi-year process to kind of get back into the quasi-normalized 67%-68% loss ratio?**

<A – Richard Barasch> **….** Well, again, multi-year is pretty open ended. We can tell with a pretty fair degree of certainty *it won't happen in 2006, but we expect to start seeing improvement toward the end of 2006 and moving into 2007.* [Emphasis added.]

93.     Following the Company's "disappointing" announcement and conference call, Scott J. Fidel, of J.P. Morgan Securities, Inc., issued a report lowering Universal American's financial estimates for 2005 through 2007. The report stated, in pertinent part, as follows:

∗       UHCO [Universal] reported disappointing 3Q05 operating EPS of $0.24, below our estimate of $0.29. On a GAAP basis, the company reported EPS of $0.25, which included $0.7 million or $0.01 per share of net realized investment gains.

∗       The earnings shortfall in the quarter was largely driven by the Medicare Supplement business, with earnings here coming in 44% below our model at $5.6 million due to an increase in medical costs and higher lapse rates due to the departure of three big producers. The higher Med Supp MLR could persist through 2006, which is expected to reduce 4Q05 EPS by $0.05 and lower expected earnings by an additional $0.12-$0.14 in 2006.

∗       We are lowering our 2005 EPS estimate to $0.95 from $1.13 and our 2006 EPS estimate to $1.38 from $1.56 due to a higher anticipated Med Supp MLR and a more conservative expectation for Part D accretion. Our 2007 estimate goes to $1.60 from $1.80.

In the section entitled "Investment Summary" the report stated, in pertinent part:

Universal American reported disappointing 3Q05 operating EPS of $0.24, below our and the Street's estimate of $0.29. On a GAAP basis, the company reported EPS of $0.25, which included $0.7 million or $0.01 per share of after-tax realized investment gains that we exclude from operating earnings. We note that the quarter included $1.3 million pre-tax ($0.01 per share after tax) in expenses for build-out of the Part D drug benefit product for 2006.

52

The earnings shortfall in the quarter was largely driven by the Medicare Supplement business, with earnings here coming in 44% below our model at $5.6 million. The Med Supp MLR was 140 basis points higher than our model due an increase in medical costs, which reduced anticipated earnings by $0.03. The higher medical costs were driven by an uptick in outpatient and skilled nursing utilization as the expected typical seasonal moderation in these components failed to materialize. Moreover, rate increases the company was implementing to cover a deductible increase in 2Q05 did not have the expected impact in materially improving the loss ratio sequentially as inferred in the company's guidance. The company expects the higher MLR could persist in the 71%-72% area for the balance of 2005 and through 2006, impacting earnings in the fourth quarter by $0.05 and lowering expected earnings by an additional $0.12-$0.14 in 2006.

UHCO also experienced higher lapse rates in their Med Supp business due to the departure of three sales managers who took their books of business with them, resulting in an additional $0.03 shortfall to earnings. While the company will look to replace the lost business by selling new policies and is evaluating legal actions against these producers, the company will also need to correctively reprice the business to return loss ratios to normalized levels, meaning that the remedial pricing actions taken by the company may cause further membership attrition as the company will be raising prices into a competitive environment. [Emphasis added.]

94.     Then, in a conference call on February 13, 2006, to discuss Universal American's fourth quarter and full year 2005 financial results, Defendant Barasch disclosed the true reasons behind the increase in the Company's Lapsation:

As you know, in the third quarter, we reported higher-than-anticipated loss ratio and Lapsation of policies in our MedSup business, and these trends continued in the fourth quarter. As we have previously disclosed, we did not experience the reduction in Lapsation that we had hoped for following improvements in November and early December. However, the numbers got worse in mid-December and have stayed at a high level through January. *We believe that there are a number of factors contributing to the Lapsation, including competitive pressure from other MedSup companies and from Medicare Advantage products, as well as the departure of certain of our sales managers.* We anticipate that we will experience similar levels of Lapsation in the first half of 2006…. [Emphasis added.]

**Undisclosed Adverse Information**

95.     The markets for Universal American securities were open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Universal American's securities traded at artificially inflated prices during

53

the Class Period.  The Class purchased or otherwise acquired Universal American securities relying upon the integrity of the market prices of Universal American securities and market information relating to Universal, and have been damaged thereby. During the Class Period, Class Action Individual Defendants materially misled the investing public, thereby inflating the price of Universal American securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.

96.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by the Class.  As described herein, during the Class Period, these Defendants made or caused to be made a series of materially false or misleading statements about Universal American business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Universal American and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. The Class Action Individual Defendants' materially false and misleading statements during the Class Period resulted in the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION/ECONOMIC LOSS

97.    During the Class Period, as detailed herein, The Class Action Individual Defendants engaged in a scheme to deceive the market, and a course of conduct that artificially inflated Universal American's stock price and operated as a fraud or deceit on Class Period purchasers of Universal American's securities by misrepresenting the Company's prospects. When

54

the Class Action Individual Defendants' prior misrepresentations and fraudulent conduct came to be revealed and was apparent to investors, shares of Universal American declined precipitously – evidence that the prior prices of Universal American's  shares were artificially inflated. As a result of their purchases of Universal American securities during the Class Period, the Class suffered economic losses, *i.e.* damages under the federal securities laws. By misrepresenting the decline in the Company's revenues and the Company's increasing expenses, among other things, the Class Action Individual Defendants presented a misleading image of Universal American's business and future growth prospects. During the Class Period, the Class Action Individual Defendants repeatedly emphasized the financial strength and well-being of the Company. These claims caused and maintained the artificial inflation in Universal American's  stock price throughout the Class Period and until the truth about the Company was ultimately revealed to investors.

98.    The Class Action Individual Defendants' materially false and misleading statements had the intended effect of causing Universal American's  shares to trade at artificially inflated levels throughout the Class Period – reaching a Class Period high of $24.89 per share on July 28, 2005.

99.    On October 28, 2005, Universal American issued a press release announcing its financial results for its third quarter of 2005, the period ended September 30, 2005. The Company announced that it missed its third quarter 2005 earnings estimates and attributed its earnings miss to, among other things: (i) a higher-than-anticipated MLR in the Medicare Supplement business that reduced anticipated earnings by $0.03 per share; and (ii) increased Lapsation in the Medicare Supplement business, which resulted in an accelerated write-down of certain non-cash deferred acquisition costs that reduced anticipated earnings by $0.03 per share.

100.    These belated disclosures had an immediate, adverse impact on the price of Universal American shares.

101.    As a direct result of the Class Action Individual Defendants' aforesaid disclosures on October 28, 2005, Universal American's  stock price collapsed to $14.17 per share – a one day decline of 36% and a decline of more than 40% from its Class Period high. This dramatic share price decline eradicated much of the artificial inflation from Universal American's share price, causing real economic loss to investors who purchased this stock during the Class Period. The decline in Universal American's stock price at the end of the Class Period was a direct result of the nature and extent of the Class Action Individual Defendants' fraud being revealed to investors and to the market. The timing and magnitude of Universal American's  stock price decline negates any inference that the losses suffered by Plaintiff and the Class were caused by changed market conditions, macroeconomic or industry factors or even Company-specific facts unrelated to the Class Action Individual Defendants' fraudulent conduct. The economic loss, *i.e.* damages suffered by the Class, was a direct result of the Class Action Individual Defendants' fraudulent scheme to artificially inflate the price of Universal American's  stock and the subsequent significant decline in the value of the Company's shares when the Class Action Individual Defendants' prior misstatements and other fraudulent conduct were revealed.

**<u>Additional Scienter Allegations</u>**

102.    As alleged herein, the Class Action Individual Defendants acted with scienter in that these Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or

documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, these Defendants, by virtue of their receipt of information reflecting the true facts regarding Universal, their control over, and/or receipt and/or modification of Universal American allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Universal, participated in the fraudulent scheme alleged herein.

103.    The Class Action Individual Defendants were further motivated to engage in this course of conduct in order to enable:

i.    these Defendants and the Company's majority shareholder to sell 5.49 million shares of their personally-held Universal American common stock for proceeds of over $122 million; and

ii.    the Company to complete the sale of 2 million shares of its common stock, excluding over-allotments to its underwriters, at $23.61 per share.

104.    The shares sold by the Class Action Individual Defendants during the Class Period were unusual in both timing and amount. The timing was unusual because the shares were sold while Defendants were in possession of undisclosed materially adverse information which they knew would negatively impact Universal American stock once it was made public and the timing of the sales was also unusual when compared with the pre-Class Period sale patterns of the Individual Defendants. The amount of shares sold was also unusual since the Class Period sales represented a significant portion of the Individual Defendants' shareholdings. Specifically, Defendants Barasch, Bryant, Waegelein and Wehner sold 8.20%, 30.00%, 23.5 8% and 40.5% of their personally-held Universal American shares, respectively, as et forth in the chart. The chart also confirms that late by September 2005, (late in the Class Period), Defendants Bryant and

Waegelein the Company's Chief Operating Officer and its Chief Financial Officer, the persons

with the most in-depth knowledge of the Company's operations, started dumping their shares:

**Universal American Financial Corp Insider Sales: 2/16/05 - 10/28/05**

| Name | Date | Shares | Price | Proceeds | End of CP Holdings | % |
|------|------|--------|-------|----------|------------|---|
| BARASCH, RICHARD | 3/1/2005 | 5,600 | $15.82 | $88,592 | | |
| | 3/1/2005 | 3,500 | $15.80 | $55,300 | | |
| | 3/1/2005 | 2,200 | $15.79 | $34,738 | | |
| | 3/1/2005 | 1,364 | $15.85 | $21,619 | | |
| | 3/1/2005 | 1,000 | $16.06 | $16,060 | | |
| | 3/1/2005 | 900 | $15.75 | $14,175 | | |
| | 3/1/2005 | 900 | $15.87 | $14,283 | | |
| | 3/1/2005 | 800 | $15.84 | $12,672 | | |
| | 3/1/2005 | 600 | $15.74 | $9,444 | | |
| | 3/1/2005 | 536 | $15.86 | $8,501 | | |
| | 3/1/2005 | 500 | $15.72 | $7,860 | | |
| | 3/1/2005 | 500 | $15.76 | $7,880 | | |
| | 3/1/2005 | 500 | $15.88 | $7,940 | | |
| | 3/1/2005 | 500 | $15.90 | $7,950 | | |
| | 3/1/2005 | 500 | $15.91 | $7,955 | | |
| | 3/1/2005 | 100 | $15.83 | $1,583 | | |
| | 4/1/2005 | 16,500 | $17.12 | $282,480 | | |
| | 4/1/2005 | 1,500 | $17.12 | $25,680 | | |
| | 4/1/2005 | 1,000 | $17.12 | $17,120 | | |

| | | | | | |
|---|---:|---:|---:|---:|---:|
| | 4/1/2005 | 1,000 | $17.12 | $17,120 | |
| | 5/2/2005 | 16,500 | $16.88 | $278,520 | |
| | 5/2/2005 | 1,500 | $16.88 | $25,320 | |
| | 5/2/2005 | 1,000 | $16.88 | $16,880 | |
| | 5/2/2005 | 1,000 | $16.88 | $16,880 | |
| | 6/1/2005 | 16,500 | $18.91 | $312,015 | |
| | 6/1/2005 | 1,500 | $18.91 | $28,365 | |
| | 6/1/2005 | 1,000 | $18.91 | $18,910 | |
| | 6/1/2005 | 1,000 | $18.91 | $18,910 | |
| | 7/1/2005 | 16,500 | $22.70 | $374,550 | |
| | 7/1/2005 | 1,500 | $22.70 | $34,050 | |
| | 7/1/2005 | 1,000 | $22.70 | $22,700 | |
| | 7/1/2005 | 1,000 | $22.70 | $22,700 | |
| | 8/1/2005 | 16,500 | $24.80 | $409,200 | |
| | 8/1/2005 | 1,500 | $24.80 | $37,200 | |
| | 8/1/2005 | 1,000 | $24.80 | $24,800 | |
| | 8/1/2005 | 1,000 | $24.80 | $24,800 | |
| | 9/1/2005 | 11,500 | $22.70 | $261,050 | |
| | 9/1/2005 | 5,000 | $22.70 | $113,500 | |
| | 9/1/2005 | 1,500 | $22.70 | $34,050 | |
| | 9/1/2005 | 1,000 | $22.70 | $22,700 | |
| | 9/1/2005 | 1,000 | $22.70 | $22,700 | |
| | 10/3/2005 | 11,500 | $23.10 | $265,650 | |
| | 10/3/2005 | 5,000 | $23.10 | $115,500 | |
| | 10/3/2005 | 1,500 | $23.10 | $34,650 | |
| | 10/3/2005 | 1,000 | $23.10 | $23,100 | |
| | 10/3/2005 | 1,000 | $23.10 | $23,100 | |
| | | **160,000** | | **$3,240,752** | **1,791,927** **8.20%** |
| | | | | | |
| BRYANT, GARY | 9/1/2005 | 20,000 | $22.75 | $455,000 | |
| | 9/2/2005 | 13,200 | $22.75 | $300,300 | |
| | 9/6/2005 | 20,000 | $22.75 | $455,000 | |
| | 9/7/2005 | 20,000 | $22.75 | $455,000 | |
| | 9/8/2005 | 20,000 | $22.91 | $458,200 | |
| | 9/9/2005 | 20,000 | $23.05 | $461,000 | |
| | 9/12/2005 | 6,800 | $23.17 | $157,556 | |
| | | **120,000** | | **$2,742,056** | **279,979** **30.00%** |
| | | | | | |
| WAEGELEIN, ROBERT | 9/1/2005 | 10,800 | $22.82 | $246,456 | |
| | 9/2/2005 | 9,900 | $22.75 | $225,225 | |
| | 9/6/2005 | 32,800 | $22.75 | $746,200 | |
| | 9/7/2005 | 6,500 | $22.75 | $147,875 | |
| | | **60,000** | | **$1,365,756** | **194,421** **23.58%** |
| | | | | | |
| WEHNER, WILLIAM | 4/1/2005 | 7,000 | $17.50 | $122,500 | |
| | 4/6/2005 | 11,868 | $17.50 | $207,690 | |
| | 4/6/2005 | 3,468 | $17.51 | $60,725 | |
| | 4/6/2005 | 2,079 | $17.52 | $36,424 | |
| | 4/6/2005 | 2,000 | $17.51 | $35,020 | |
| | 4/6/2005 | 585 | $17.53 | $10,255 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 4/7/2005 | 19,800 | $17.50 | $346,500 | | |
| | 4/7/2005 | 200 | $17.51 | $3,502 | | |
| | 4/8/2005 | 20,000 | $17.50 | $350,000 | | |
| | 4/11/2005 | 20,000 | $17.50 | $350,000 | | |
| | 4/13/2005 | 20,000 | $17.60 | $352,000 | | |
| | 4/14/2005 | 15,000 | $17.67 | $265,050 | | |
| | 4/14/2005 | 15,000 | $17.50 | $262,500 | | |
| | 4/14/2005 | 5,000 | $17.72 | $88,600 | | |
| | 4/19/2005 | 8,000 | $17.50 | $140,000 | | |
| | | **150,000** | | **$2,630,766** | **220,335** | **40.50%** |
| CAPITAL Z FINANCIAL SERVICES FUND II, L.P. | 6/22/2005 | **4,973,580** | $22.43 | **$111,557,399** | **20,180,892** | **19.77%** |
| CAPITAL Z FINANCIAL SERVICES PRIVATE FUND II, L.P. | 6/22/2005 | **26,420** | $22.43 | **$592,601** | **106,844** | **19.83%** |
| **Total:** | | **5,490,000** | | **$122,129,330** | | |

105.    In comparison, these Individual Defendants sold considerably less of their Universal American stock before the Class Period. A chart of the Individual Defendants' insider trades for the entire year of 2004 follows:

| Last Name | First Name | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| BARASCH | RICHARD | 6/14/2004 | **30,000** | $10.37 | **$311,100** |
| | | | | | |
| BRYANT | GARY | 6/22/2004 | 10,000 | $10.90 | $109,000 |
| BRYANT | GARY | 6/23/2004 | 10,000 | $10.90 | $109,000 |
| | | | **20,000** | | **$218,000** |
| | | | | | |
| WAEGELEIN | ROBERT | 6/14/2004 | **15,000** | $10.37 | **$155,550** |
| | | | | | |
| WEHNER | WILLIAM | 6/17/2004 | 15,000 | $10.81 | $162,150 |
| | | 6/18/2004 | 15,000 | $10.63 | $159,450 |
| | | 6/21/2004 | 15,000 | $10.72 | $160,800 |
| | | 6/22/2004 | 15,000 | $10.58 | $158,700 |
| | | 6/23/2004 | 15,000 | $10.76 | $161,400 |
| | | 6/24/2004 | 15,000 | $10.73 | $160,950 |
| | | 6/25/2004 | 10,000 | $10.80 | $108,000 |
| | | | **100,000** | | **$1,071,450** |

## ADDITIONAL ALLEGATIONS

### Motivation to Engage in the Secondary Offering

106.    On or about July 30, 1999 Defendants Capital Z, Barasch the Company and others entered into the Shareholders' Agreement which provided for *inter alia* the right of Capital Z to designate and have elected four Universal American Directors, subject to adjustment based on its percentage shareholding, and for Defendant Barasch to designate and have elected two Universal American Directors.  From the inception of this procedure in 1999, Capital Z has designated Defendants Spass and Cooper, and later Defendant Leathers and Mark M. Harmeling as Defendants. From the inception Barasch has designated himself and Director Bertram Harnett.

107.    The Class Action Individual Defendants had significant motivation to have Capital Z sell its shares, as set forth at pp. S-20-21 in the Prospectus Supplement dated June 16, 2005:

We are effectively controlled by our principal shareholder.

Approximately 45% of our outstanding common stock is owned by Capital Z Financial Services Fund II, L.P., a private investing entity, and its affiliates (collectively, "Capital Z") prior to giving effect to this offering. See "Principal and Selling Shareholder." Our board of directors consists of nine members. Under a shareholders agreement we entered into in 1999 with Capital Z and Richard A. Barasch, our Chairman and CEO, the parties are obligated to vote for directors designated as follows:

- •    four nominated by Capital Z,

- •    two nominated by Mr. Barasch, and

- •    three nominated by our board of directors.

61

After the completion of this offering these provisions will continue to be in effect, except that only three directors may be designated by Capital Z and four directors shall be designated by our board of directors. Accordingly, Capital Z currently is, and will continue to be, able to exert a significant amount of influence over our corporate actions, including any matters which require a vote of our board of directors or our shareholders, and can disapprove matters submitted to a supermajority vote of our shareholders. This concentration of ownership and control by Capital Z could delay or prevent a change in control of our holding company which change in control could be advantageous to other shareholders, or depress the trading market for our common stock.

108.    Capital Z and the Capital Z Individual Defendants also had significant motivation to sell shares in the Secondary Offering. As a result of the Offering, Capital Z recouped its entire original investment in Universal American, realizing a seven time gain on the sale. In addition, Capital Z still held 20 million Universal American shares.  The enormous benefit to Capital Z was publicly reported, as stated in part in an article appearing in The Deal on June 20, 2005:

> Capital Z has begun to cash out of its investment in specialty insurer Universal American Financial Corp., which has increased in the value 7 times since 1999.
>
> Universal American, a Rye Brook, N.Y.-based health and life insurance company that targets seniors, announced that it had executed a 7 million secondary offering of common stock Thursday, June 16, at $23.61 per share.
>
> Five million of those shares belonged to its largest shareholder, New York private equity firm Capital Z, which stands to pocket $118 million in proceeds. The deal will reduce its stake in Universal to 20.1 million shares, or 34.9%, from 45.1%, according to a regulatory filing. Its remaining holding was worth $469 million at Friday's price.
>
> Capital Z invested $81 million in the publicly traded company, paying just $3.15 a share, in July 1999, according to a securities filing. The PIPE investment helped fund Universal's acquisition of the Career Sales Division of PennCorp Financial Group, said Universal's CFO Robert Waegelein. Capital Z's investment has grown in value to $587 million, including the realized and unrealized gains.

109.    As the representatives of Capital Z, Defendants Spass, Cooper and Leathers were intimately involved in understanding the workings of the Company and its business. Each is an acknowledged expert in the insurance business and Capital Z specializes in acquiring equity

positions in insurance business entities. Accordingly, each of these Defendants understood the trends of the Company during the Class Period and recognized the desirability for Capital Z to sell shares in June 2005.

110.    Given the huge investment that Defendants Cooper, Spass and Leathers had in Universal American, through Capital Z, (and in the case of Cooper and Spass, their positions on the Universal American Executive Committee of the Board)**,** their access to material non-public information, their role as designees of Capital Z bound to protect its interests, these Defendants cannot be regarded as ordinary outside directors, but rather knowledgeable insiders.

**<u>Incentive Compensation Issues</u>**

111.    As set forth in the 2006 Proxy Statement at p. 26, bonuses are paid based on the following criteria:

> The Company's Compensation Committee makes recommendations to the Board for awards of cash incentive bonuses to the Company's executive officers. This incentive compensation is designed to provide financial rewards for the achievement of individual and Company goals and other performance objectives approved annually by the Compensation Committee. Incentive compensation objectives are designed to motivate the Company's officers and to encourage growth while taking into account non-routine factors that may be integral to the success of the Company. The fiscal year 2005 cash bonuses paid to our Named Executive Officers were, in the aggregate, 71.9% of their 2005 annualized aggregate base salaries.

112.    As set forth in the 2006 Proxy Statement at p. 29, compensation of Defendant Barasch was set as follows:

> The Compensation Committee determines Mr. Barasch's compensation consistent with the principles noted above and the terms of his employment agreement, dated July 30, 1999, which provides the Compensation Committee discretion in determining his base compensation and target bonuses. Mr. Barasch's 2005 base salary was $764,909 (for the 12 months from April 1, 2005 to March 31, 2006), an increase of 3% over his 2004 base salary for the prior 12 month period.

Mr. Barasch's 2005 base salary was established based on the Compensation Committee's review of his performance in 2004 and according to the terms of his employment agreement.

The Compensation Committee acknowledged the extraordinary *effort of Mr. Barasch and the other officers of the Company* during a challenging year that included entrance into a new and difficult business. In recognition of Mr. Barasch's performance in 2005 and the achievement of certain operating goals that had been set for 2005, the Compensation Committee awarded him a cash bonus of $803,154, or 105% of his 2005 base salary. Additionally, Mr. Barasch was awarded 9,772 restricted shares of the Company's common stock which vest in equal increments over a four-year period. In determining these bonus amounts, the Compensation Committee considered the Company's performance over the past several years and, specifically, the Company's performance in 2005 in relation to established goals, and compared that performance to prior years' results. The Compensation Committee believes that Mr. Barasch's total compensation earned for fiscal 2005 (including salary, bonus and the restricted stock grant) is appropriate  in light of his strong leadership, together with his achievements and the progress in furthering the Company's operational initiatives.

The Compensation Committee has set Mr. Barasch's 2006 base salary (for the 12 months beginning April 1, 2006) at $787,856, representing an increase of 3% over his 2005 base salary. The Compensation Committee has set Mr. Barasch's target bonus for 2006 at 150% of his base salary.  (Emphasis added)

113.    Thus, despite the wrongdoing by Defendants Barasch and others, the Universal American Board has awarded them with largess.

## Material Weaknesses in Internal Controls

114.    Despite previous statements to the contrary, the Company acknowledged material weaknesses in its financial controls. As stated at p. 41 of the Company's 2005 Annual Report on Form 10-K:

*We have identified a material weakness in our internal control over financial reporting, and our business and stock price may be adversely affected if we have*

*not adequately addressed the weakness or if we have other material weaknesses or significant deficiencies in our internal control over financial reporting.*

We have identified a material weakness in our internal control over financial reporting as of December 31, 2005, relating to the accounting for our Medicare Supplement claim reserves and amounts recoverable from reinsurers. Specifically, our analysis and review controls were not sufficient to ensure that our estimated claims reserves, amounts recoverable from reinsurers and net incurred claims for our Medicare Supplement business were appropriately stated. As a result of this weakness, our internal controls did not detect the need for adjustments to the amounts initially recorded for these items. Based on additional analysis and procedures performed, management made adjustments in the fourth quarter of 2005 to our claim reserves and amounts recoverable from reinsurers as of December 31, 2005 and the related incurred claims expense for the year ended December 31, 2005 for our Medicare Supplement business prior to the issuance of the consolidated financial statements as of December 31, 2005. The existence of one or more material weaknesses or significant deficiencies could result in errors in our consolidated financial statements, and substantial costs and resources may be required to rectify any internal control deficiencies. If we cannot produce reliable financial reports, investors could lose confidence in our reported financial information, the market price of our stock could decline significantly, we may be unable to obtain additional financing to operate and expand our business, and our business and financial condition could be harmed.

115.    As a result of the failure to maintain controls, Universal American's  Independent

Registered Public Accounting Firm, Ernst & Young LLP rendered a qualified audit opinion, set

forth in relevant part below:

### Report of Independent Registered Public Accounting Firm

The Board of Directors and Stockholders of
Universal American Financial Corp.

********

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Universal American Financial Corp.'s internal control over financial reporting as of December 31, 2005, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated March 14, 2006 expressed an unqualified opinion on management's assessment of internal control over

financial reporting, *and an adverse opinion on the effectiveness of internal control over financial reporting.*

/s/ Ernst & Young LLP

New York, New York
March 14, 2006

(Emphasis added)

## DERIVATIVE ALLEGATIONS

116.    Plaintiff brings this action as a derivative action pursuant to Federal Rules of Civil Procedure 23.1 on behalf of and for the benefit of Universal American.

117.    Plaintiff will fairly and adequately represent the interests of Universal American in enforcing and prosecuting its rights, and has retained competent counsel experienced in this type of litigation to prosecute this action.

## DEMAND IS EXCUSED FOR FUTILITY

118.    Demand on Universal American to bring this action has not been made and is not necessary because such demand would be futile.  The Board of Universal American at the time suit was filed consisted of the following nine Directors: defendants Barasch, Cooper, Spass and Leathers, and Mark M. Harmeling, Bertram Harnett, Linda H. Lamel, Patrick J. McLaughlin, and Robert F. Wright. Directors Barasch, Harnett, Cooper, Leathers and Spass, who constitute a majority of the nine-member Board, are interested and any demand upon them is futile.  Accordingly, plaintiff did not make any demand on the Board of Universal American to institute this action because such a demand would have been a futile, wasteful and useless act, particularly for the reasons listed below.

119.    Defendant Barasch is not in a position to exercise independent business judgment with respect to the claims alleged herein because he is an officer of the Company and is

66

interested in the events herein. The Universal American Board has acknowledged that Defendant Barasch is not independent in its 2005 Proxy Statement. Further, according to the Class Action Complaint, defendant Barasch engaged in improper insider trading activities during the Class Period. Defendant Barasch sold 160,000 of his personally held Universal American stock for proceeds in excess of $3.2 million. Because defendant Barasch has an interest in the events herein and has received a personal financial benefit from the challenged insider trading transactions, there is reasonable doubt that he could fairly assess the propriety of a pre-suit demand, when such inquiry would cause defendant Barasch to face a substantial threat of liability for his own insider selling of the Company's shares. Since defendant Barasch has breached his fiduciary duty and is interested, any demand upon him is futile.

120. The Universal American Board has acknowledged that Bertram Harnett is not independent in its 2006 Proxy Statement. Director Harnett derives a personal financial benefit from the Company. Defendant Harnett is a shareholder in the law firm of Harnett, Lesnick & Ripps, P.A. of Boca Raton, Florida, which provides significant legal services to the Company. Accordingly, Director Harnett is incapable of impartially considering a pre-suit demand to commence and vigorously prosecute this action against his fellow Board members, since such action would jeopardize the on-going business relationship that his law firm has with Universal American. Further Harnett is Defendant Barasch's designated Director pursuant to the Shareholders' Agreement, and thus is beholden to him. Thus, demand on Director Harnett is futile.

121. Defendants Cooper, Leathers and Spass are not in a position to exercise independent business judgment with respect to the claims alleged herein due to Defendants Capital Z's sale of Universal American shares in the Secondary Offering. These Defendant

Directors are three of the four Capital Z appointees to the Board.  Capital Z is Universal American's largest shareholder, holding approximately 34.8 percent of the Company's outstanding common stock.  Defendant  Cooper is a Senior Vice President, Director, Partner and co-founder of Capital Z.  Defendant  Leathers is a Principal of Capital Z.  Defendant Spass is the Chairman of the Board, a Partner and co-founder of Capital Z.  During the Class Period, Capital Z sold approximately 5,000,000 Universal American shares in the Company's June 16, 2005 Offering, for proceeds exceeding $112 million. Because Directors Cooper, Leathers and Spass received very material personal financial benefits from sale in the Secondary Offering, there is reasonable doubt that they could fairly assess the propriety of a pre-suit demand. There is more than reasonable doubt as to whether these Defendants could exercise independent business judgment to allow this suit to go forward under circumstances where their own liability and that of Capital Z would be called into serious question.

122.    The Universal American Board has pre-judged this matter. On November 29, 2005, Universal American issued a press release announcing that a purported class action lawsuit was filed.  The Company issued the following statement:

> **Universal American has reviewed the allegations contained in the complaint and believes that they are without merit.** Universal American intends to vigorously defend itself against the complaint. Universal American also noted that several additional law firms have announced the commencement of actions on behalf of shareholders that are believed to be similar in substance. [emphasis supplied].

Since the Universal American Board has determined that the allegation of the Class Action are meritless, the Directors could not fairly decide to institute suit against the Defendants here, because they have pre-judged the matter.  Therefore, reasonable doubt exists as to all Board

members because they have pre judged this matter and are not in position to fairly asses the propriety of a pre-suit demand.

123.   Universal American's officers and directors are insured against personal liability for their various acts as alleged in this Complaint by directors' and officers' liability insurance. However, a suit authorized by Universal American Board on behalf of the Company against the Board, its directors or officers would not be covered by the insurance, wherein a suit by a shareholder derivatively on behalf of the Company would be covered by the insurance. Accordingly, the directors are conflicted and have no impetus to institute suit where the net result would be to vitiate insurance they now possess.

124.   Based on the foregoing, a majority of the members of the Company's Board of Directors are not disinterested and cannot exercise independent business judgment on the issue of whether Universal American should prosecute this action.  As a result, demand on Universal American and its Board of Directors was futile and therefore excused.

## FIRST CAUSE OF ACTION
### (Against The Class Action Individual Defendants for Contribution Pursuant to Sections 10(b) and 21D of the Exchange Act)

125.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

126.   Defendants had a duty not to defraud the investing public by the dissemination of materially false and misleading press releases and the dissemination of materially false and misleading financial information and projections.

127.   The Class Action Individual Defendants have been sued in the Class Action alleging that the Class Action Individual Defendants caused the Company to issue false

69

and misleading statements as alleged above and, as a result, the Company and these defendants violated Section 10(b) of the Exchange Act.

128.    It is alleged in the Class Action that the Class Action Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. These Defendants, by virtue of their receipt of information reflecting the true facts regarding Universal American, their control over, and/or receipt and/or modification of Universal American's allegedly materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning Universal American, participated in the fraudulent scheme alleged herein.

129.    These Individual Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.    The ongoing alleged fraudulent scheme alleged in the Class Action could not have been perpetrated over a substantial period of time without the knowledge and complicity of the personnel at the highest level of the Company, including these Individual Defendants.

130.    During the Class Period, it is alleged in the Class Action Complaint that the Class Action Individual Defendants carried out a plan, scheme and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including the Class members, as alleged herein; (ii) enabled Defendants to register for sale with the SEC,

70

millions of shares of their privately held Company stock; (iii) enabled Universal American and certain Company insiders to sell approximately $122 million of their privately held Universal American shares while in possession of material adverse non-public information about the Company; and (iii) caused plaintiff and other members of the Class to purchase Universal American common stock at artificially inflated prices. As alleged in the Class Action, these defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Universal American's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. These defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

131.    In addition to the duties of full disclosure imposed on these defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to disseminate truthful information promptly that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's business, so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

132.    It is alleged in the Class Action that the Class Action Individual

Defendants, individually and in concert, directly and indirectly, by the use of the mails or other means or instrumentalities of interstate commerce, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, and future prospects of Universal American as specified herein. These Defendants are alleged to have employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Universal American's value and future profitability. This included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Universal American and its business, operations and future prospects, in the light of the circumstances under which they were made, not misleading, and engaging in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Universal American securities during the Class Period.

133.    As alleged in the Class Action, as a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Universal American's securities was artificially inflated during the Class Period.  Unaware of the fact that the market price of Universal American's shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by these defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by these defendants but not disclosed in public statements during the Class Period, Class members acquired Universal American's

securities during the Class Period at artificially high prices and were damaged thereby.

134.    As alleged in the Class Action, at the time of said misrepresentations and omissions, the Class members were unaware of their falsity, and believed them to be true. Had the members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Universal American, which were not disclosed by these defendants, members of the Class would not have purchased or otherwise acquired their Universal American securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

135.    As alleged in the Class Action, by virtue of the foregoing, these Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5.

136.    It is further alleged in the Class Action that the Company participated in the wrongful conduct and is equally liable for violation of Section 10(b) of the Exchange Act. Assuming that the Company is liable, these Individual Defendants caused the Company to violate Section 10(b) of the Exchange Act, and incur liability for damages for violation of the federal securities laws.

137.    If the Company is deemed to have violated the federal securities laws, and incurs damages therefore, the Class Action Individual Defendants are liable to the Company for contribution pursuant to sections 10(b) and 21(D) of the Exchange Act.

## SECOND CAUSE OF ACTION
### (Against the Class Action Individual Defendants for Breach of Fiduciary Duty)

138.    Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

139.    The Class Action Individual Defendants owed and owe Universal American fiduciary obligations.    By reason of their fiduciary relationships, the Class Action Individual Defendants owed and owe Universal American the highest obligations of good faith, fair dealing, loyalty and due care.

140.    These Defendants breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

141.    Each of the Class Action Individual Defendants had actual or constructive knowledge that they had caused Universal American to improperly misrepresent the business and prospects of the Company.  These actions could not have been a good faith exercise of prudent business judgment.  Moreover, certain of the Class Action Individual Defendants are asserted to have engaged in the actions alleged in the Class Action, which would be a breach of their duty to conduct the business of the Company only through lawful and proper means.

142.    As a direct and proximate result of the Class Action Individual Defendants' misconduct, Universal American has suffered and will continue to suffer significant damages.  As a result of the misconduct alleged herein, these Individual Defendants are liable to the Company.

### THIRD CAUSE OF ACTION
**(Against the Class Action Individual Defendants
for Breach of Fiduciary Duty for
Insider Selling, and Unjust Enrichment)**

143.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though, fully set herein.

74

144.    At the time of the stock sales set forth herein, these Defendants knew or recklessly disregarded or would have known but for disregard of their fiduciary duties, the information described above, and sold Universal American common stock on the basis of material adverse non-public information.  Collectively, they sold millions of their personally held stock.

145.    By reason of their positions as directors and/or officers of the Company, these Defendants owed a fiduciary duty to the Company and its shareholders in connection with the operations, management, and direction of the Company, and to refrain for the use of material adverse non-public information for their own personal benefit.

146.    By misusing such information and selling their shares at prices in excess of the prices prevailing in Universal American stock at the end of the Class Period, these Defendants profited from the misuse of such information.

147.    As a result of these Defendants' misuse of Company information, these Defendants have breached their fiduciary duties and have been unjustly enriched.

148.    Accordingly, they are required to pay over to the Company, the profits earned on their sales of Universal American shares.

**FOURTH CAUSE OF ACTION**
**(Against The Class Action Individual Defendants for Breach of the Duty**
**of Full Disclosure and Complete Candor)**

149.    Plaintiff incorporates by reference all previous allegations.

150.    Whenever directors communicate publicly or directly with shareholders about the corporation's affairs, with or without a request for shareholder action, directors have a fiduciary

duty to shareholders to exercise due care, good faith and loyalty. When directors communicate publicly or directly with shareholders about corporate matters the *sine qua non* of directors' fiduciary duty to shareholders is honesty.  Moreover, a fiduciary who learns that her earlier communications to her beneficiaries were false and nonetheless knowingly and in bad faith remains silent even as the beneficiaries continue to rely on those earlier statements also breaches his duty of loyalty and of full and fair disclosure.

151.    Each of the Class Action Individual Defendants has breached his/her duty of full disclosure and complete candor by knowingly and/or recklessly disregarding the falsity and misleading nature of the information which they caused it to be disseminated to the investing public.

152.    In addition to the duties of full disclosure imposed on the Class Action Individual Defendants as a result of their making affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to disseminate truthful information promptly that would be material to investors in compliance with the integrated disclosure provisions of the SEC regulations, including accurate and truthful information with respect to the Company's business, so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

153.    As a direct and proximate result of the Class Action Individual Defendants' breach of full disclosure and complete candor, Universal American has sustained significant damages arising out of the alleged material misstatements to the investing public, and these Individual Defendants are liable to the Company.

## FIFTH CAUSE OF ACTION
### (Against the Class Action Individual Defendants
### for Return of Unearned Compensation

154.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

155.    In 2005, the Compensation Committee elected to award substantial bonuses to Defendants Barasch, Waegelein and Bryant. It is believed that Defendant Wehner also received a bonus. The Compensation Committee determined that these amounts were appropriate given the Company's financial performance and the contribution made by these Defendants to the Company's performance.

156.    By reason of their positions as directors and/or officers of the Company, these Defendants owed a fiduciary duties to the Company and its shareholders in connection with the operations, management, and direction of the Company.

157.    Based on the failure to legitimately achieve the Company's financial and business goals, for which they were paid bonuses and incentive compensation, the bonuses and other incentive payments were not properly awarded for the work performed and the results achieved. Since these Defendants have not obtained the business results expected, they have been unjustly enriched and must  return to the Company the bonus compensation and incentive payments awarded.

## SIXTH CAUSE OF ACTION
### (Against the Capital Z Individual Defendants for Breach of Fiduciary Duty

158.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

159.    By their actions alleged herein, the Capital Z Defendants abandoned and

abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Universal American in a manner consistent with the operations of a publicly held corporation, and assuring themselves that the Company's financial statement and key pronouncements were true and correct prior to authorizing the Secondary Offering, and allowing Capital Z to sell its shares in that Offering.

160.   As a direct and proximate result of these Defendants' breaches of fiduciary duty, Universal American has sustained significant damages arising out of the alleged material misstatements to the investing public and damages to the Company arising *inter alia* from the Secondary Offering, which placed an additional 5 million shares previously owned by Capital Z in the public float and for which damages are now sought against the Company in the Class Action.

161.   These Defendants are liable to the Company for all damages flowing therefrom, including common law contribution.

## SEVENTH CAUSE OF ACTION
### (Against Defendant Capital Z For Unjust Enrichment)

162.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

163.   During the Class Period, Defendant Capital Z sold approximately 5 million of its own Universal American shares in the Secondary Offering.

164.   As a result of this sale Capital Z was enriched. This enrichment was at the Company's expense. The sale of 5 million Universal American shares by Capital Z enlarged the public float in Universal American shares, which has vastly increased the Company's liability in

the Class Action.  Thus, while Capital Z has handsomely profited, the Company is subject to vastly increased liability as a result of the Capital Z's sale in the Secondary Offering.

165.    The circumstance are such that equity and good conscience demand that Capital Z should return any profit made in the Offering to the Company. .

## JURY DEMAND

166.    Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment as follows:

A.    Against the Class Action Individual Defendants for contribution pursuant to Sections 10(b) and 21(D) of the Exchange Act;

B.    Against all of the Individual Defendants for the damages sustained by Universal American as a result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; as set forth herein;

C.    Equitable and/or injunctive relief as permitted by law;

D.    Restitution and disgorgement of unjust enrichment;

E.    Attorneys' fees and costs; and

F.    Any such other and further relief as may be just and proper.

Dated:   New York, New York
         July 19, 2006

ROY JACOBS & ASSOCIATES

By: /s/ <u>Roy L. Jacobs</u>
Roy L. Jacobs (RLJ 0286)

60 East 42nd Street 45th Floor
New York, NY 10165
Tel. (212) 867-1156
Fax (212) 504-8243

rljacobs@pipeline.com

Laurence D. Paskowitz (LP-7324)
THE PASKOWITZ LAW FIRM, P.C.
60 East 42nd Street—46th Floor
New York, NY 10165
Tel. (212) 685-0969
Fax (212) 685-2306

classattorney@aol.com

*Attorneys for Plaintiff*